Ia39frac

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PERRY A. FRANKEL, M.D., ET
AL.,

                    Plaintiffs,

            v.                          18 CV 6378 (ER)

U.S. HEALTHCARE, INC., ET AL.,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        October 3, 2018
                                        10:20 a.m.

Before:

                    HON. EDGARDO RAMOS

                                        District Judge

                         APPEARANCES

CUSHNER & ASSOCIATES, P.C.
      Attorney for Plaintiffs
BY:   TODD STEVEN CUSHNER

THE LAW OFFICE OF CHARLES A. HIGGS
      Attorney for Plaintiffs
BY:   CHARLES A. HIGGS

CONNELL FOLEY LLP
      Attorney for Defendants
BY:   PATRICIAN ANN LEE

ELLIOTT GREENLEAF, PC
      Attorney for Defendants
BY:   MARK J. SCHWEMLER

Ia39frac

1          (Case called)

2          MR. CUSHNER:  Your Honor, Todd Cushner with the Law

3     Office of Cushner & Associates, for plaintiff Perry Frankel.

4          MR. HIGGS:  Good morning, your Honor.  Charles Higgs

5     Office of Charles Higgs, for the plaintiff, cocounsel.

6          MS. LEE:  Good morning, your Honor.  Patricia Lee from

7     the law firm of Connell Foley on behalf of the Aetna

8     defendants.

9          MR. SCHWEMLER:  Good morning, your Honor.  Mark

10    Schwemler from the law firm of Elliott Greenleaf, also on

11    behalf of defendants.

12         THE COURT:  The parties can be seated.  You can remain

13    seated.  Just please speak directly into the microphone.

14         This matter is on for premotion conference.  However,

15    this is the first time that the parties appear before me.

16         MR. CUSHNER:  That's correct, your Honor.

17         THE COURT:  So Mr. Cushner or Mr. Higgs, why don't you

18    tell me a little bit about your case.

19         MR. CUSHNER:  Your Honor, what we have here is a

20    cardiovascular doctor surgeon who has been performing services

21    for Aetna for over 20 years.  He has an interesting practice in

22    that he provides services to union representatives who are

23    lower income range.  What he does is at the request of the

24    union leaders he comes to the union halls with a van or an RV

25    with equipment and provides health care services to employees

Ia39frac

1    who either work double shifts or don't have the ability to get

2    to regular health care.  And he provides those services within

3    these RVs.  And during the course of his 20 years he's

4    represented a significant amount of unions in the City of

5    New York, transit workers, the people who run our trains, our

6    buses, and he's been successful in saving lives over the past

7    20 plus years.  And he was terminated for reasons unknown to

8    the plaintiff and there is a significant balance due on

9    previously performed services.

10             THE COURT:  Was he on a contract?

11             MR. CUSHNER:  Yes.

12             THE COURT:  And was he given any indication as to why

13   he was fired?

14             MR. HIGGS:  Your Honor, they had indicated that they

15   were rationalizing their network.  It was just a general

16   statement.  But the overview was the plaintiff's advocacy for

17   use of these mobile clinics.  So when we say RV, these are

18   fully equipped.

19             MR. CUSHNER:  Mobile medical clinics.

20             MR. HIGGS:  Right.

21             THE COURT:  OK.

22             MR. HIGGS:  So after 20 years of contract with no

23   issues, all of a sudden the defendant used rationalizing its

24   network without any explanation as to what exactly that was.

25   But the general reason for the -- that we believe for

Ia39frac

1  termination was the provider's advocacy on behalf of his

2  patients and providing these services to his --

3          THE COURT:  Was the contract for a set term?  Were

4  they annually renewable?

5          MR. CUSHNER:  Annually renewable and had been

6  renewable for more than 20 years.

7          THE COURT:  How could the contract be terminated by

8  either party?  What were the terms of that, if you know?

9          MR. CUSHNER:  I believe one of the reasons is if he

10  lost his license to practice or for numerous other things.  I'd

11  have to refer back to the provider agreement.

12          THE COURT:  If the defendants wanted to terminate the

13  contract for any reason there was -- is there like a notice

14  provision?  Are you alleging that they didn't provide -- or

15  that they didn't comport with the provisions in the contract

16  for terminating it.

17          MR. HIGGS:  I believe it was 90 days before the start

18  of the year.

19          THE COURT:  OK.

20          MR. HIGGS:  And so subsequent to discussion of

21  termination the parties had been extending the contract.  But I

22  do not believe that they actually terminated it in that 90-day

23  period before the start of the year.

24          THE COURT:  So what did you understand -- you said

25  rationalizing the network.  What did you understand that phrase

Ia39frac

1   to mean?

2           MR. CUSHNER:  We don't understand it.

3           MR. HIGGS:  We understood that is essentially a cover.

4           THE COURT:  A pretext?

5           MR. HIGGS:  Yes.  No real rationalization.

6           MR. CUSHNER:  Your Honor, I'd like to add that an

7   appeal was made of that decision and the answer that came back

8   was rationalizing our network so there was never a real

9   explanation as to why after 20 years of exemplary service he

10  was terminated.

11          THE COURT:  OK.  Thank you.

12          Ms. Lee or Mr. Schwemler.

13          MS. LEE:  Your Honor, on behalf of Aetna.

14          THE COURT:  Do you want to bring the microphone closer

15  please.

16          MS. LEE:  Your Honor, on behalf of Aetna our position

17  is that the contract, of course, was properly terminated,

18  notice was properly given, and that the contract affords the

19  ability of Aetna to terminate for cause or for convenience at

20  the annual renewal period.

21          Prior representatives for the plaintiffs were made

22  aware that Aetna had raised concerns about billing practices of

23  the plaintiff.  So there has been disclosures in that regards

24  between the parties.

25          THE COURT:  Prior representatives you mean prior

Ia39frac

1    lawyers?

2              MS. LEE:  Yes.

3              THE COURT:  OK.

4              MS. LEE:  And our position is that at the crux of the

5    case it is about whether or not Aetna owes what they allege to

6    be an outstanding balance for unpaid services and whether or

7    not those services are compensable would arise basically under

8    the plan terms of whether the services performed were a covered

9    service.

10             The contract with this provider is to be part of a

11   network.  It's not a guarantee of payment, although there are

12   payment terms within the contract such as the timing for

13   payment, and appeals of payment and the rate for payment and

14   things of that nature.  The actual coverage, the benefit that

15   is provided to the member who receives the services, is

16   dictated by the terms of each of the individualized benefit

17   plans that come from either an individual plan or an employer

18   sponsor plan.

19             And so we believe that this case actually boils down

20   to really a complaint about a denial of coverage for a service

21   across a number of different patients and plans.

22             The issue of the termination is separate.  They have

23   not -- I don't think the two tie together in terms of the

24   unpaid balance versus the termination.  Going forward, as

25   plaintiff mentioned, Aetna has given notice.  Appeal has been

Ia39frac

1    denied and presently the plaintiff is out of network and he

2    can -- the plaintiff can still service members of Aetna's plans

3    but he will be on an out-of-network basis.

4              THE COURT:  The disputes concerning payments, are

5    these disputes that have been ongoing for 20 years, or are they

6    of recent vintage, if you know?

7              MS. LEE:  They are of more recent vintage.  Because of

8    the billing concerns that came to Aetna's attention, there was

9    an audit of the plaintiffs' records.  And that some of the

10   issues that may be at play with some of the unpaid claims may

11   be related to some of those billing concerns and they may be

12   related to other unique issues with regard to coverage for that

13   particular member.

14             THE COURT:  What is it that you want to do?

15             MS. LEE:  Your Honor, we're looking for leave to file

16   a motion to dismiss.  We believe that the complaint can be

17   cleaned up a lot.  There are, as we mention in our premotion

18   letter, a number of plans at issue here that arise under the

19   ERISA federal statute.  And because of that we believe that the

20   state common law claims as to any ERISA plan will be preempted.

21             We also believe as to the state law counts that may

22   survive any preemption argument that they on their face fail

23   for a number of reasons.  We've outlined them more at a high

24   level in our letter.  But, in particular, there are elements of

25   each of the causes of action that may either be duplicative

8

Ia39frac

1   that are not based on an obligation or duty independent of the

2   contract itself and, thus, would be subsumed within the breach

3   of contract count.  And we also believe that the statutory

4   claims require certain elements that have not been pled.

5           THE COURT:  What about with respect to the federal

6   claims?

7           MS. LEE:  Your Honor, with respect to the federal

8   claims, in terms of a breach of contract, the claims can be

9   pursued with a proper assignment under the ERISA statute.  So

10  that would be our position.

11          But in terms of the Affordable Care Act claims which

12  are derived from the Civil Rights Act we believe they fail on

13  their face.  Plaintiff has not set forth the elements necessary

14  including an allegation that the actions of Aetna actually were

15  targeted and intended to affect a protected class.

16          THE COURT:  And the HIPAA claim?

17          MS. LEE:  The HIPAA claim, as we outlined in our

18  letter, Aetna has a right under its contractual agreement with

19  the plaintiff to request records, to audit any records while a

20  provider is part of the network.  And the agreement

21  specifically says that any records provided to Aetna will be

22  bound under HIPAA and protected under HIPAA as Aetna is

23  independently obligated to do.

24          THE COURT:  So if the complaint currently stays as is

25  you intend to move to dismiss the entire thing?

Ia39frac

1          MS. LEE:  Correct, your Honor.

2          THE COURT:  Mr. Cushner.

3          MR. CUSHNER:  I believe there are certain open aspects

4    of this case which need to be addressed and to dismiss it would

5    be premature without discovery and have us take a look at what

6    the plan is all about and various other things of that nature.

7    There's a public policy interest here in that these workers

8    are -- need to be serviced.  They are being serviced and now

9    they're being denied service.  They paid for this service.

10         MR. HIGGS:  Your Honor, this is, I believe, as you've

11   heard from defendant, after 20 years of no issues with billing,

12   all of a sudden there is this supposed billing pretext for

13   termination of the contract but they haven't used that as their

14   reason for terminating the contract.  The reason that was given

15   for terminating the contract was rationalization of their

16   network.

17         So I believe discovery would be appropriate to

18   demonstrate whether, as they claim, there are billing issues.

19   They claim they've done an audit.  We'd like to see what

20   billing issues, if any, they claim there are because we don't

21   believe that there are any.

22         THE COURT:  You were not made aware of the results of

23   the audit?

24         MR. HIGGS:  No, I don't believe so.

25         MR. CUSHNER:  No.

Ia39frac

1            And as to the HIPAA issue, that goes to -- not to

2    actions where the defendant was upfront and advising the

3    plaintiff that they were seeking records.  This was based on

4    conversations where the defendant was going behind defendants'

5    back to some of the defendants' employees to kind of, with this

6    threatening pretext of well the plaintiff -- you know, the

7    doctor hasn't been billing properly, providing us these files,

8    you know, you don't want to be caught up in this, that sort of

9    thing.

10            THE COURT:  But is Ms. Lee incorrect that the contract

11    provides for the provision of that information and that if it's

12    provided it will be maintained in accordance with federal

13    regulations?

14            MR. HIGGS:  I believe that it --

15            MR. CUSHNER:  I would assume that there would be a

16    procedure for requesting it from a doctor or somebody who is at

17    liberty to disclose that information as opposed to picking an

18    employee and saying send us records.

19            MR. HIGGS:  And especially I think there has to be

20    reasoning for exchange of that information, not if they had

21    questions approving for billing, not so that they can just do

22    this kind of behind-the-scenes investigation of general claims

23    without a patient or doctor, either knowledge of the patient or

24    the doctor.

25            THE COURT:  So I just want to understand what you're

Ia39frac

1    saying.

2              What you're saying is that even though the contract

3    may have provided for the exchange of information that is

4    generally safeguarded under HIPAA, what Aetna did here was that

5    it reached out directly to take union members who were --

6              MR. HIGGS:  No.

7              MR. CUSHNER:  A technician.

8              THE COURT:  The technician meaning?

9              MR. CUSHNER:  Technician, some employee who worked on

10   a machine.

11             THE COURT:  So they reached out to an employee of

12   Dr. Frankel?

13             MR. HIGGS:  Yes.

14             MR. CUSHNER:  Yes, your Honor.

15             THE COURT:  And you're saying that going directly to

16   an -- one of his employees is going behind his back?

17             MR. HIGGS:  Well, it wasn't on the -- it wasn't under

18   the standard protocol or for determination as to whether a

19   particular patient should be covered for certain services or

20   whether their medical history justified payment.  It was --

21   we're not really sure what it was that they were doing but it

22   was related to the ongoing dispute between the parties and not

23   as to whether a particular patient is entitled to services or

24   approval or denial of a claim or anything of that sort.

25             THE COURT:  So Aetna would call the doctor's office

Ia39frac

1   and speak with a technician and what would they ask?  Would

2   they ask:  Did you conduct this test on this day?  Was that

3   basically what was going on?

4          MR. HIGGS:  We're not entirely sure of the context.

5   Essentially they were doing it not with the doctor's knowledge

6   and asking -- asking the employee to provide this information

7   without advising the doctor because under this -- under the

8   context of well there's been unfair billing or your billing

9   practices haven't been correct.

10          THE COURT:  Let me ask you this.  When Aetna called

11   and spoke with particular employees of the doctor did they tell

12   his employees don't tell the doctor that I called.

13          MR. HIGGS:  That's our understanding.

14          MR. CUSHNER:  That's our understanding.

15          THE COURT:  OK.  Ms. Lee.  Let me ask you in the first

16   instance.  The audit to which you referred, were the results of

17   that audit shared with Dr. Frankel, if you know?

18          MS. LEE:  Yes.  I believe it was, your Honor, through

19   his prior counsel.

20          THE COURT:  When was that, approximately, if you know?

21          MS. LEE:  I don't know, your Honor.

22          THE COURT:  And what about with respect to the going

23   behind the doctor's back to speak with his employees.  Do you

24   have any insight into that?

25          MS. LEE:  Your Honor, my understanding is that there

Ia39frac

 1    is typical audit letters that are sent out to the provider's

 2    office which outline the request for records, particular

 3    patient files that are requested, and then a follow-up call may

 4    be made to the office to follow up the letter that was sent

 5    formally to the doctor's office.

 6           So this would not be anything that is going behind a

 7    provider's back.  The letter would have been addressed directly

 8    to the plaintiff's office.

 9           THE COURT:  OK.  Now, Mr. Cushner and Mr. Higgs one of

10    the reasons why I have these conferences is to see if we can't

11    streamline the work that needs to be done.  And based on the

12    letter that's been submitted by defendants and their

13    representations here today do you see or can you see whether

14    there is any way that you can amend the complaint in an effort

15    to address some of these challenges and avoid briefing?

16           MR. HIGGS:  Well, at this point I don't know that

17    further amendment could be done.  However, after discovery I

18    believe that will flesh out further detail in this case and I

19    think that the facts will support the plaintiffs' position

20    here.  To move for dismissal at this point, without at least

21    allowing some preliminary discovery between the parties, I

22    don't think briefing on dismissal would be appropriate at this

23    point.

24           MS. LEE:  Your Honor, we believe that the arguments we

25    have set forth would be appropriate for a motion to dismiss on

Ia39frac

1     the face of the pleadings.  We feel that there are apparent

2     deficits from the complaint, when coupled with the attachments

3     to the complaint, that make clear that plaintiffs have not

4     alleged the required elements for each of the causes of action.

5             THE COURT:  Very well.  How much time do you need to

6     make your motion?

7             MS. LEE:  We would like 30 days.

8             THE COURT:  30 days.

9             30 days to respond.

10            Two weeks to reply.

11            THE DEPUTY CLERK:  The motion is due November 5.

12            The response is due December 5.

13            And the reply is due December 19.

14            THE COURT:  Do you have those dates?

15            MS. LEE:  Yes, your Honor.

16            THE COURT:  OK.  We're adjourned.

17            (Adjourned)

18

19

20

21

22

23

24

25