# EXHIBIT A

## SPECIALIST PHYSICIAN AGREEMENT

## EXECUTION SHEET

This Specialist Physician Agreement ("Agreement") is made and entered into by and between U.S. Healthcare, Inc., d/b/a Aetna U.S. Healthcare, a New York corporation, on behalf of itself and its Affiliates (as defined below) (hereinafter "Company"), and the licensed physician signing below (hereinafter "Provider").

Subject to any necessary regulatory approvals, the Effective Date of this Agreement shall be the later of (i) the date that this Agreement is signed by both parties; or (ii) the date that Provider is fully credentialed and approved by the applicable Company peer review committee.

Company and Provider mutually desire to enter into an agreement whereby Provider will provide Covered Services in the specialized field of _____ (hereinafter called "Specialty") to Members with the objective of delivering cost-effective quality health care services.

In consideration of the mutual covenants and promises stated herein and other good and valuable consideration, the parties hereby enter into this Agreement.

This Execution Sheet, Agreement and the specified Schedules constitute the complete and sole contract between the parties regarding the subject hereof and supersede any and all prior or contemporaneous oral or written communications or proposals not expressly included herein. Provider also acknowledges that by signing this Agreement, Provider agrees to abide by the quality improvement, utilization management and other applicable rules, policies and procedures of the licensed health maintenance organization ("HMO"), preferred provider organization ("PPO") plans, and other health benefit plans or products issued, administered or serviced by Company.

By executing this Execution Sheet, Provider acknowledges and agrees that Provider has reviewed all of the terms and conditions of this Agreement and intends to be legally bound by same.

| COMPANY | PROVIDER |
|---|---|
| Accepted By: _(signature)_ | _Pe M_ |
| Printed Name: JERRY FRANK M.D. | _Perry Frank_ |
| Title: MEDICAL DIRECTOR | (Print Name) |
| Date: 4/7/98 | Address: 410 Lakeville w |
| | City: Lake Success |
| | State: NY   Zip: 11042 |
| | Date: 8/22/97 |
| | Federal Tax ID No. ████ |

## SPECIALIST PHYSICIAN AGREEMENT

This Agreement is entered into by and between Company and the Provider who has signed the Execution Sheet attached hereto.

### 1.0   SPECIALIST PHYSICIAN SERVICES

1.1   <u>Provision of Covered Services.</u>   Provider shall provide to Members those Specialist Services which are within the scope of Provider's license and certification to practice.   Provider may not provide any Covered Services to Members unless and until Provider has been fully credentialed and approved by the applicable peer review committee.   Provider shall provide Emergency Services to Members as necessary.   It is understood and agreed that Company, or, when applicable, the Payor shall have final authority to determine whether any services provided by Provider were Covered Services and to adjust or deny payments for services rendered by Provider to Members in accordance with the results of such determinations.

1.2   <u>Non-Discrimination.</u>   Provider shall accept and treat as patients all Members without regard to the health status or health care needs of such Members, and shall protect the rights of such Members as patients. Provider shall not differentiate or discriminate in the treatment, or in the access to treatment, of Members on the basis of race, gender, creed, ancestry, lawful occupation, age, religion, marital status, sexual orientation, mental or physical disability, color, national origin, place of residence, health status, source of payment for services, cost or extent of Covered Services required, status as Members, or any other grounds prohibited by law or this Agreement.   Provider shall provide Covered Services to Members: (a) in no less than the same manner and in accordance with at least the same standards as offered to Provider's other patients; and (b) in accordance with at least the same standard of practice, care, skill, and diligence customarily used by similarly situated physicians at the time at which such services are rendered.   Provider shall not provide or threaten to provide inferior care or imply to Members that their care or access to care will be inferior due to the source of payment.

1.3   <u>Referral by Primary Care Physician.</u>   Provider shall provide Specialist Services to Members only upon prior referral of such patients by a Primary Care Physician to Provider on prescribed forms or by electronic means as instructed by Company, if such a referral is required by the applicable Plan.   Except in the case of the provision of Emergency Services, payment for retroactive referrals shall be subject to adjustment or denial by Company.   Company reserves the right to utilize other specialist physicians in the same field in which Provider practices.   Provider shall render services to Members only at those inpatient, extended care, and ancillary service facilities which have been approved in advance by Company.   Provider agrees promptly to submit a report on the treatment of each Member to the referring Primary Care Physician, if applicable.

### 2.0   REPRESENTATIONS

2.1   <u>Provider Representation.</u>   Provider represents that: (a) Provider has and shall maintain throughout the term of this Agreement all appropriate license(s) and certification(s) mandated by governmental regulatory agencies, including without limitation DEA certification and an unrestricted license to practice medicine in the state(s) in which Provider maintains offices and provides Specialist Services to Members; (b) Provider is board certified or board eligible in the Specialty; (c) Provider shall comply with all applicable federal and state laws related to this Agreement and the services to be provided hereunder, including, but not limited to, statutes and regulations related to fraud, abuse, discrimination, disabilities, confidentiality, self-referral, false claims and prohibition of kickbacks; (d) Provider has and shall maintain throughout the term of this Agreement unrestricted hospital privileges at a Participating Hospital; and (e) executing and performing his/her obligations under this Agreement shall not cause Provider to violate any term or covenant of any other arrangement now existing or hereafter executed.

2.2   Qualified Personnel.   Provider also represents that Provider has established an ongoing quality assurance/assessment program which includes, but is not limited to, credentialing of employees and subcontractors. Provider shall supply to Company the relevant documentation, including, but not limited to, internal quality assurance/assessment protocols, state licenses and certifications, federal agency certifications and/or registrations upon request. Provider further represents that all personnel employed by, associated or contracted with Provider who treat Members: (a) are and shall remain throughout the term of this Agreement appropriately licensed and/or certified and supervised (when and as required by state law), and qualified by education, training and experience to perform their professional duties; and (b) shall act within the scope of their licensure or certification, as the case may be.   Company may audit Provider's compliance with this section upon prior written notice. Provider must obtain the approval of Company prior to utilizing any subcontractors to provide Covered Services to Members and any such subcontracting must be in compliance with New York law.

## 3.0   PROVIDER COMPENSATION

3.1         Payment.   Company shall, or when it is not the applicable Payor shall notify each Payor to, pay Provider for Specialist Services rendered to Members in accordance with: (a) the then-current Company Reasonable, Equitable Fee Schedule (REF); or, if REF is not applicable to the Specialist Services provided by Provider, then (b) the compensation arrangement then in effect as applicable to such Specialist Services provided by Provider, which arrangement may provide for Provider to receive capitation payments (without withhold) for the Specialist Services provided hereunder; either of which may be modified from time to time by Company. Capitation shall be used by a Payor as a method of compensation only to the extent permitted by New York law. Provider's compensation for non-capitated Covered Services rendered to Members shall be (A) the lower of (i) the compensation arrangement in effect hereunder, or (ii) Provider's reasonable and customary billed charge, and (B) minus any applicable Copayments, Coinsurance, or permitted Deductibles. Provider shall notify Company of any overpayments or payments made in error within ten (10) business days of becoming aware of such overpayments or erroneous payments, and shall return or arrange the return of any such overpayments or payments made in error to Company, or to the Payor or Member, as applicable. Company reserves the right to rebundle to the primary procedure those services determined by Company to be part of, incidental to, or inclusive of the primary procedure. To the extent that any Specialist Services are reimbursed on a capitated basis, Provider shall hold Company, Affiliates, Sponsors, Members and Payors harmless against any and all claims by covering providers related to or arising out of payment for such Covered Services rendered to Members. Notwithstanding anything in this Agreement to the contrary, during such time as Provider is a member of a group which is a Participating Provider ("Group") which has entered into a Physician Group Agreement with Company, Provider agrees to seek compensation solely from Group for those Covered Services provided to Members and for which Group is compensated by Company on behalf of Provider, and Provider shall in no event bill Company, its Affiliates, Payors or Members for any such Covered Services (except for the collection of Copayments, Coinsurance or Deductibles in accordance with Section 3.2).

3.2   Billing of Members.   Under certain Plans, Members may be required to pay Copayments, Coinsurance or permitted Deductibles for certain Covered Services.   Provider shall collect any applicable Copayments, Coinsurance and permitted Deductibles from Members.   Copayments shall be collected at the time that Covered Services are rendered.   Except for applicable Copayments, Coinsurance and permitted Deductibles, Provider may bill Members only in the circumstances described below.

3.2.1   If the applicable Payor is not an HMO, Provider may bill a Member for Specialist Services provided to the Member in the event that the Payor becomes insolvent or otherwise breaches the terms and conditions of its agreement to pay, provided that: (a) Provider shall have first exhausted all reasonable efforts to obtain payment from the Payor; and (b) Provider shall not institute or maintain any collection activities or proceed with any action at law or in equity against a Member to collect any sums that are owed by a Payor to Provider unless Provider provides at least thirty (30) days prior notice to Company of Provider's intent to institute such an action.

3.2.2 Services that are not Covered Services may be billed to Members by Provider only if: (a) the Member's Plan provides and/or Company confirms that the services are not covered; (b) the Member was advised in writing prior to the services being rendered that the specific services are not Covered Services; and (c) the Member agreed in writing to pay for such services.

Nothing in this section is intended to prohibit or restrict Provider from billing individuals who were not Members at the time that services were rendered.

3.3   Coordination of Benefits.   When a Payor is the primary payor under applicable coordination of benefit principles, the Payor shall pay in accordance with this Agreement, and when a Payor is secondary under said principles, Payor's payment shall be limited as specified in the applicable Plan.  If the Plan fails to specify coordination of benefits requirements, and unless prohibited by applicable law, Payor's payment shall be limited to the amount which, together with the amount paid by the primary payor following all reasonable efforts by Provider to collect same, equals the compensation due to Provider under this Agreement, or if the primary payor fails to pay, Payor's payment shall be in accordance with this Agreement.  In no event shall amounts billed and retained under coordination of benefits for Covered Services exceed Provider's usual and customary billed charges for such services.  Provider agrees that coordination of benefit monies will become the property of Company.  Provider shall participate in coordination of benefits, but the collection must accrue to Company.

3.4   Company's Obligation to Pay.   Company shall have no obligation to pay Provider for Specialist Services in the event that a Payor or Member fails to pay Provider, except where Company is the underwriter of the applicable Plan.

3.5   Claims Submission.   Provider shall submit claims to Company or the applicable Payor for non-capitated Covered Services rendered to Members.  Claims shall be submitted within ninety (90) days of a Member's receipt of such Covered Services or Provider's receipt of an explanation of benefits from a primary payor.  Billings shall include detailed and descriptive medical and Member data and identifying information on HCFA 1500 forms or any subsequent form adopted for that purpose.   Provider shall submit bills electronically as required by Company or the applicable Payor.  Company utilizes CPT-4 for the coding, description of services, and rules for the services provided.  If Provider has not billed Company or the applicable Payor for such Specialist Services within the stated time frame, Provider's claim for compensation with respect to such Specialist Services shall be deemed waived, and Provider shall not bill any other person or entity, including, but not limited to, Company, the applicable Payor, Sponsor, or Member, for such Specialist Services.  Statements made in any claim or related documentation submitted by or on behalf of Provider shall be considered statements made by Provider, regardless of whether such statements are prepared by Provider's employees, agents, or representatives.  Any adjustments to claims submitted by Provider must be filed with Company or the applicable Payor within thirty (30) days of the submission of the original claim, or the original claim will be deemed final.

3.6   Holding Members Harmless.   If the applicable Payor is an HMO, Provider hereby agrees that in no event, including, but not limited to, non-payment by the HMO, insolvency of the HMO or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse against a Member, a Member's family members or persons (other than the HMO) acting on a Member's behalf for services provided pursuant to this Agreement.  This provision shall not prohibit collection of permitted Deductibles, Coinsurance, or Copayments from Members in accordance with the terms of the Member's Plan.

Provider further agrees that: (a) this provision shall survive termination of this Agreement regardless of the cause giving rise to termination and shall be construed for the benefit of Members; and (b) this provision supersedes any oral or written agreement to the contrary now existing or hereafter entered into between Provider and a Member or persons acting on a Member's behalf.

## 4.0   COMPLIANCE WITH COMPANY RULES, POLICIES AND PROCEDURES

4.1   Compliance and Participation.  Provider shall comply fully with and be bound by the Participation Criteria described in the **Participation Criteria Schedule** (attached hereto and made a part hereof) and shall also abide by the rules, policies and procedures that Company has established or will establish, including, but not limited to, those regarding: (a) quality improvement/management; (b) utilization management, including, but not limited to, precertification of elective admissions and procedures, referral process or protocols, and reporting of clinical encounter data; (c) claims payment review; (d) Member grievances; (e) provider credentialing; and (f) electronic submission of referrals, encounter data, claims and other data required by Company.  Provider acknowledges and agrees that failure to comply with the terms of the Participation Criteria and Company's other rules, policies and procedures may adversely affect any compensation due hereunder and could lead to sanctions including, without limitation, termination of this Agreement in accordance with Article 7.  Company may at any time modify the Participation Criteria, and all Company rules, policies and procedures.

4.2   Utilization Review.   Company utilizes systems of utilization review/quality improvement/peer review consistent with applicable federal and state laws to promote adherence to accepted medical treatment standards and to encourage Participating Providers to control medical costs consistent with sound medical treatment.  To this end, Provider agrees:

a)   To participate, as requested, and to abide by Company's utilization review, patient management, quality improvement programs, and all other related programs (as modified from time to time) and decisions with respect to all Members.

b)   To comply with Company's pre-certification and utilization management requirements for all elective admissions and other Covered Services.

c)   To regularly interact and cooperate with Company's Nurse Case Managers.

d)   To utilize Participating Providers to the fullest extent possible, consistent with sound medical judgment.

e)   To abide by all Company's credentialing criteria and procedures, including site visits and medical chart reviews, and to submit to these processes biannually, annually, or otherwise, when applicable.

f)   To cooperate with the Member's Primary Care Physician, if applicable, including timely scheduling of appointments and appropriate communication after patient evaluation and treatment.

4.3   Grievances.   Provider agrees to cooperate with and participate in Company's applicable grievance procedures, provide Company with the information necessary to resolve grievances, and abide by decisions of the applicable grievance committees.

4.4   Notices and Reporting.  Provider shall: (a) notify Company of any litigation brought against Provider related to the provision of health care services; (b) notify Company of any actions taken or investigations initiated by any government agency involving Provider or any health care entity in which Provider holds more than a five percent (5%) interest; (c) notify Company of any ownership interest or position with another health maintenance organization or other managed care organization or health plan; and (d) comply with any Company requirements regarding reporting of self-referrals, loss of licensure or accreditation, and claims by governmental agencies or individuals regarding fraud, abuse, self-referral, false claims, or kickbacks.  All notices required by this section shall be provided to Company within ten (10) business days of the date that Provider acquired knowledge of the occurrence of an event requiring notice, or earlier if otherwise required by this Agreement.  Upon Company's request, Provider shall provide all known details of the nature, circumstances and disposition of any suits, claims, actions or investigations to Company.

4.5     Assignments of Benefits and Consents to Release of Medical Information. Provider shall obtain from all non-HMO Members to whom Specialist Services are provided: (a) signed assignments of benefits authorizing payment for Specialist Services to be made directly to Provider or Provider's designee; and (b) consents to release medical information to Company and Payors or their authorized representatives.

4.6     Accreditation and Review Activities. Provider shall implement all activities reasonably necessary to assist Company to obtain external accreditation by the National Committee for Quality Assurance or any other similar organization selected by Company including, but not limited to, cooperating in the auditing of Members' medical records. Similarly, Provider shall fully cooperate with any review of Company or a Plan conducted by a state or federal agency with authority over Company and/or a Plan, as applicable. Provider acknowledges Company's obligation and right to report to and access the National Practitioner Data Bank ("Data Bank") as it relates to Provider. Provider shall assist Company in accessing and reporting to the Data Bank, including submitting inquiries to the Data Bank on behalf of Company if requested to do so.

4.7     Proprietary and Confidential Information. Provider agrees that the Proprietary Information is the exclusive property of Company or a third party Payor and that Provider has no right, title or interest in the same. Provider shall keep the Proprietary Information and this Agreement strictly confidential and shall not disclose any Proprietary Information or the contents of this Agreement to any third party, except to federal, state and local governmental authorities having jurisdiction to the extent approved by Company or required by law. Provider shall not use any Proprietary Information, and shall, at the request of Company, return any Proprietary Information and any copies or abstracts thereof, upon termination of this Agreement for whatever reason. In the event of a breach or a threatened breach of this section by Provider, Company shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, and such rights and remedies shall be cumulative. This section shall survive the termination of this Agreement, regardless of the cause of termination.

4.8     Encounter Data. For those services for which Provider is compensated on a capitated basis, Provider shall provide Company with encounter data by type of Specialist Service rendered to Members in the form and manner as specified by Company. Such encounter data shall be the property of Company.

## 5.0     INSURANCE

5.1     Provider's Insurance. Provider has and shall maintain throughout the term of this Agreement professional liability and comprehensive liability insurance in at least the minimum amounts specified in the **Participation Criteria Schedule.**

## 6.0     INSPECTION OF RECORDS AND DATA ACCESS.

6.1     Access to Information. Provider agrees that Company, on behalf of itself and its Affiliates, shall have access to all data and information obtained, created or collected by Provider related to Members ("Information"). Such Information shall be jointly owned by Provider and Company, and Provider shall not enter into any contract or arrangement whereby Company or its Affiliates do not have unlimited free and equal access to the Information in electronic or other form or would be required to pay any access, transaction or other fee to obtain such Information in electronic, written or other form. Information shall not be directly or indirectly provided by Provider to any competitor of Company or Company's Affiliates. Any and all information and data provided to Provider by Company or at Company's direction shall remain the sole and exclusive property of Company and shall not be disclosed by Provider to any third party.

6.2     Confidentiality of Medical Records. Provider and Company agree that all Member medical records shall be treated as confidential so as to comply with all state and federal laws regarding, among other things, the confidentiality of patient records. According to the terms of Company's HMO enrollment forms, agreements with Members and applicable law, Company is authorized to obtain information from Provider without additional written release by the Member. Company shall have the right upon request to inspect at all reasonable times any accounting, administrative, and medical records maintained by Provider pertaining to Company, Members, and Provider's participation hereunder.

6.3    Provision of Records.  Provider agrees to provide Company and federal, state and local governmental authorities having jurisdiction, upon request, access to all books, records and other papers (including, but not limited to, medical and financial records) and information relating to this Agreement and to those Covered Services rendered by Provider to Members, and, notwithstanding anything to the contrary in this Agreement, to maintain such books, records and papers and Information for the longer of: (a) six (6) years after termination of this Agreement; (b) six (6) years from the age of majority for those Members who are minors; or (c) the period required by state law.  All requested Information shall be supplied within fourteen (14) days of the receipt of the request, where practicable.  This audit right may be extended to Company's customers upon request of Company.

6.4    Medical Records.  Provider shall maintain Information in a current, detailed, organized and comprehensive manner and in accordance with customary medical practice, applicable state and federal laws, and accreditation standards.  Medical records of Members shall include reports from referred and/or referring providers, discharge summaries, records of emergency care received by the Member and such other signed progress notes which, at a minimum, shall contain the principal complaint or purpose of the visit, diagnosis or findings and therapeutic procedure.  Provider shall make these records available to: (a) Company for the purpose of assessing quality of care, conducting medical evaluations and audits and determining, on a concurrent or retrospective basis, the medical necessity and appropriateness of care provided to Members; and (b) applicable state and federal authorities and their agents involved in assessing the quality of care or investigating Member grievances or complaints.  Notwithstanding any other provision in this Agreement to the contrary, medical records of all Members will be made available to the New York Department of Health for purposes of inspection and copying.

6.5    Survival.  These data access and records provisions shall survive the termination of this Agreement regardless of the cause giving rise to the termination.

**7.0    TERM AND TERMINATION**

7.1    Term and Renewal.  This Agreement shall commence on the Effective Date and, subject to the termination provisions contained herein, shall continue for an initial term of one (1) year and shall thereafter automatically renew for successive one (1) year periods.

7.2    Termination by Non-Renewal.  This Agreement may terminate upon any anniversary of the Effective Date, provided that the party desiring not to renew this Agreement provides at least sixty (60) days prior written notice of such non-renewal to the other party.

7.3    Termination for Breach.  Subject to the requirements of New York Public Health Law §4406-d, Company may terminate this Agreement at any time upon at least sixty (60) days prior written notice of such termination to Provider upon default or breach by Provider of one or more of its obligations hereunder.  This Agreement may be terminated at any time by Provider upon at least sixty (60) days prior written notice of such termination to Company upon default or breach of Company of one or more of its obligations hereunder, unless such default or breach is cured within sixty (60) days of the notice of termination.

7.4    Immediate Termination or Suspension.  This Agreement may be immediately terminated, or Provider's participation in any or all Plans immediately suspended, by Company at its sole discretion at any time due to: (a) a final disciplinary action by a state licensing board or other governmental agency that impairs Provider's provision of health care services; (b) a determination of fraud by Provider; or (c) Company's determination, in its sole discretion, that continuation of this Agreement could result in imminent harm to patient care.  Provider shall provide immediate notice to Company of any of the aforesaid events.

7.5    Obligations Following Termination.  Following the effective date of any termination of this Agreement, or any Plan, Provider shall comply with the following obligations.  This section shall supersede any contrary arrangements now existing or hereinafter made and shall survive the termination of this Agreement, regardless of the cause of termination.

7.5.1  Upon Termination.  Upon termination of this Agreement for any reason, other than termination by Company in accordance with section 7.4 above, (i) Provider shall remain obligated to provide Covered Services to: (a) any Member under Provider's care who, at the time of the termination, is a registered bed patient at a Participating Provider that is a hospital or other institution or is undergoing a course of treatment until medically appropriate completion, such Member's discharge therefrom or Company's orderly transition of such Member's care to another provider, whichever is less; and (b) any Member, upon request of such Member or the applicable Payor, until the anniversary date of such Member's respective Plan or for one (1) calendar year, whichever is less; provided that, to the extent the time period set forth in this section 7.5.1(i)(b) for any Member is shorter than the time period set forth in section 7.5.1(i)(a) above for such Member, Provider shall in any event provide Covered Services to such Member for the time period set forth in section 7.5.1(i)(a); and (ii) Provider shall provide Covered Services to any Member undergoing an ongoing course of treatment with Provider, (a) for a transitional period of up to ninety (90) days from the date on which such Member is notified of Provider's disaffiliation from Company's network; or (b) if Member has entered the second trimester of pregnancy at the time of Provider's disaffiliation, for a transitional period that includes the provision of post-partum care directly related to the delivery.  The terms of this Agreement shall apply to such services.

7.5.2  Upon Insolvency or Cessation of Operations.  If this Agreement terminates as a result of insolvency or cessation of operations of Company or a Company Affiliate that is an HMO, and as to Members of HMOs that become insolvent or cease operations, then, in addition to the other obligations set forth in this section (including the obligations set forth in section 7.5.1 above), Provider shall continue to provide Covered Services to: (a) all Members for the period for which premium has been paid; and (b) Members confined in an inpatient facility on the date of insolvency or other cessation of operations until medically appropriate discharge.  This section shall be construed to be for the benefit of Members.  No modification to this section shall be effective without the prior written approval of the applicable regulatory agencies.

7.5.3  Obligation to Cooperate.  Upon notice of termination of this Agreement or of a Plan, Provider shall cooperate fully with Company and comply with Company procedures, if any, in the transfer of Members to other providers.

## 8.0   MODIFICATIONS

8.1  Amendments.  This Agreement constitutes the entire understanding of the parties hereto and no changes, amendments, or alterations shall be effective unless signed by both parties, except as expressly provided herein.  Notwithstanding the foregoing, at Company's discretion, Company may amend this Agreement upon written notice to Provider to comply with any applicable law or regulation, or any order or directive of any governmental agency.  Any material amendment to this Agreement requires the prior approval of the New York State Department of Health thirty (30) days in advance of its anticipated execution.

8.2  Plan Participation.  Company has and retains the right to designate Provider as a Participating Provider or non-participating provider in any specific Plan.  Company reserves the right to introduce new Plans during the course of this Agreement.  Provider agrees that Provider will provide Covered Services to Members of such Plans under applicable compensation arrangements determined by Company.  Provider shall accept compensation in accordance with this Agreement for the provision of any Covered Services to Members under a Plan, regardless of whether Provider is a Participating Provider in such Plan.  Company has or intends to seek a contract to serve Medicare and/or Medicaid beneficiaries.  Such beneficiaries shall be considered as Members.  Provider shall be bound by all requirements applicable to such contract and all rules and regulations of the Medicare and Medicaid programs.

## 9.0   RELATIONSHIP OF THE PARTIES

9.1  Independent Contractor Status.  The relationship between Company and Provider and their respective employees and agents is that of independent contractors, and none shall be considered an agent or

representative of the other for any purpose, nor shall any party or its agents or employees hold themselves out to be an agent or representative of any other party for any purpose. Company and Provider will each be liable solely for their own activities and those of their agents and employees, and neither Company nor Provider will be liable for the activities of the other or the agents and employees of the other, including, without limitation, any liabilities, losses, damages, injunctions, suits, actions, fines, penalties, claims or demands of any kind or nature by or on behalf of any person, party or governmental authority arising out of or in connection with: (a) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement; (b) any negligent act or omission or other misconduct; (c) the failure to comply with any applicable laws, rules or regulations; or (d) any accident, injury or damage. Provider acknowledges that all patient care and related decisions are the sole responsibility of Provider and that Company's medical management procedures, protocols and policies do not dictate or control Provider's clinical decisions with respect to the medical care or treatment of Members. Provider agrees to indemnify and hold harmless Company from all claims, liabilities or other causes of action, including costs and counsel fees, related to the activities, actions or omissions of Provider or Provider's agents or employees. This provision shall survive the termination of this Agreement, regardless of the cause giving rise to termination.

9.2 Use of Name. Provider consents to the use of Provider's name and other identifying and descriptive material in provider directories and in other materials and marketing literature of Company in all formats, including, but not limited to, electronic media. Provider shall not use Company's names, logos, trademarks or service marks in marketing materials or otherwise, except as provided in this Agreement, without Company's prior written consent.

9.3 Interference with Contractual Relations. Provider shall not: (a) counsel or advise, directly or indirectly, Payors, Sponsors or other entities who are currently under contract with Company or any Affiliate to cancel, modify, or not renew said contracts; (b) impede or otherwise interfere with negotiations which Company or an Affiliate is conducting for the provision of Plans; or (c) use or disclose to any third party membership lists acquired during the term of this Agreement for the purpose of directly or indirectly soliciting individuals who were or are Members or otherwise to compete with Company or any Affiliate. Nothing in this section is intended or shall be deemed to restrict any communication between Provider and a Member determined by Provider to be necessary or appropriate for the diagnosis and care of the Member. This section shall survive the termination of this Agreement. In the event of a breach or a threatened breach of this section by Provider, Company shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, and such rights and remedies shall be cumulative.

## 10.0 COMPANY OBLIGATIONS

10.1 Company Obligations. Company or Payors shall provide Provider with a means to identify Members (e.g., identification cards). Company shall further provide Provider with an explanation of benefits available to Members, utilization standards, administrative requirements, a listing of physicians, hospitals and ancillary providers in Company's network, and timely notification of significant changes in this information. Company will enable Provider to check eligibility. Company will include Provider in the applicable Participating Provider directory or directories and will make such directories available to Members. Company shall provide a dispute resolution mechanism whereby Provider may raise issues regarding the obligations of either party under this Agreement. Provider agrees to utilize this dispute resolution procedure prior to submitting a complaint to any regulatory agency or instituting any legal action.

## 11.0 MISCELLANEOUS

11.1 Waiver. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach thereof. To be effective, all waivers must be in writing and signed by the party to be charged.

11.2 Governing Law. This Agreement shall be governed in all respects by the laws of the State of New York.

NY\SPEC 1.10 (8/96)                    -9125-

11.3   Statute of Limitations.  Notwithstanding section 11.2, no action, regardless of form, arising out of or related to this Agreement may be brought by any party more than twelve (12) months after such cause of action has arisen.

11.4   Severability.  Any determination that any provision of this Agreement or any application thereof is invalid, illegal or unenforceable in any respect in any instance shall not affect the validity, legality and enforceability of such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Agreement.

11.5   Inconsistencies.  If any term or provision of this Agreement is inconsistent with a term or provision of a non-insured Plan, then as to individuals entitled to receive Covered Services through said Plan, the term or provision of the Plan shall prevail.

11.6   Assignment.  This Agreement, being intended to secure the services of Provider, shall not be assigned, subcontracted, delegated or transferred in any manner.  Without limitation, this provision prohibits the transfer of this Agreement in connection with any sale of Provider's practice.  Company may assign, delegate or transfer this Agreement in whole or in part to any Affiliate, existing now or in the future, or to any entity which succeeds to the applicable portion of its business through a sale, merger or other transaction, provided that such other entity assumes the obligations of Company hereunder.  Any assignment of this Agreement must have the prior approval by the New York State Department of Health.

11.7   Affirmative Action.  Company is an Equal Opportunity Employer which maintains an Affirmative Action Program.  To the extent applicable to Provider, Provider agrees to comply with the following, as amended from time to time:  Executive Order 11246, the Vietnam Era Veterans Readjustment Act of 1974, the Drug Free Workplace Act of 1988, Section 503 of the Rehabilitation Act of 1973, any similar legislation regarding transactions relating to any government contract of Company or an Affiliate, and any rules and regulations promulgated under such laws.

11.8   Headings.  The headings contained in this agreement are included for purposes of convenience only, and shall not affect in any way the meaning or interpretation of any of the terms or provisions of this Agreement.

11.9   Notices.  Any notice required to be given pursuant to the terms and provisions hereof shall be effective only if given in writing and sent by overnight delivery service with proof of receipt, or by certified mail return receipt requested.  Notices shall be sent to the following addresses (which may be changed by giving notice in conformity with this section):

To Provider at:

and to Company at:

**Aetna U.S. Healthcare**
**Provider Contract Management**
**1000 Middle Street  MC2S**
**Middletown, CT  06457**

11.10  Non-Exclusivity.  This Agreement is not exclusive, and nothing herein shall preclude either party from contracting with any other person or entity for any purpose. Company makes no representation or guarantee as to the number of Members who may select or be assigned to Provider.

11.11 Entire Agreement.  This Agreement (including any attached schedules) constitutes the complete and sole contract between the parties regarding the subject hereof and supersedes any and all prior or contemporaneous oral or written communications or proposals not expressly included herein.

## 12.0  DEFINITIONS

When used in this Agreement, all capitalized terms shall have the following meanings:

12.1  Affiliate.  An Affiliate, with respect to Company, means any corporation, partnership or other legal entity (including any Plan) directly or indirectly owned or controlled by, or which owns and controls, or which is under common ownership or control with, Company.

12.2  Coinsurance.   The percentage of the lesser of: (a) the rates established under this Agreement; or (b) Provider's reasonable and customary billed charges, which a Member is required to pay for Covered Services under a Plan.

12.3  Copayment.  A charge required under a Plan that must be paid by a Member at the time of the provision of Covered Services.

12.4  Covered Services.  Those Medically Necessary Services which a Member is entitled to receive under the terms and conditions of a Plan.

12.5  Deductible.  An amount that a Member must pay for Covered Services per specified period in accordance with the Member's Plan before benefits will be paid.

12.6  Emergency Services.  Emergency Services shall mean, unless otherwise defined in the applicable Plan, Medically Necessary Services to preserve life or stabilize health, available on an inpatient or outpatient basis, twenty-four (24) hours per day, seven (7) days per week.

12.7  Medically Necessary Services.  Medically Necessary Services shall mean, unless otherwise defined in the applicable Plan, health care services that are appropriate and consistent with the diagnosis in accordance with accepted medical standards and which are likely to result in demonstrable medical benefit, and which are the least costly of alternative supplies or levels of service which can be safely and effectively provided to the patient.  Medically Necessary Services do not include custodial or supportive care or rest cures, or services or supplies provided for the convenience of the patient, the patient's family, or the provider.  When used in relation to hospital inpatient care, Medically Necessary Services only include those services and supplies that cannot be safely and satisfactorily provided at home, in a physician's office, as an outpatient service, or in any lesser facility.  Medically Necessary Services must be related to diagnosis or treatment of an existing illness or injury, except for preventive and well baby care.  Health services are not Medically Necessary Services if they are experimental services.  Medical necessity, when used in relation to services, shall have the same meaning as Medically Necessary Services.

12.8  Member.  An individual covered by or enrolled in a Plan.

12.9  Participating Provider.  Any physician, hospital, skilled nursing facility, or other individual or entity involved in the delivery of health care or ancillary services who or which has entered into and continues to have a current valid contract with Company to provide Covered Services to Members, and has been credentialed by Company or its designee consistent with Company's credentialing policies.   Certain categories of Participating Providers may be referred to herein more specifically as, e.g., "Participating Physicians" or "Participating Hospitals."

12.10  Payor.  An employer, insurer, health maintenance organization, labor union, organization or other person or entity which has agreed to be responsible for funding benefit payments for Covered Services provided to Members under the terms of a Plan.

NY\SPEC 1.10 (8/96)                                        -11125-

12.11  Plan.  Any health benefit product or plan issued, administered, or serviced by Company or one of its Affiliates, including, but not limited to, HMO, PPO, indemnity, Medicaid, Medicare and Worker's Compensation.

12.12  Primary Care Physician.  A Participating Physician whose area of practice and training is family practice, general medicine, internal medicine or pediatrics, or who is otherwise designated as a Primary Care Physician by Company, who has agreed to provide primary care services and to coordinate and manage all Covered Services for Members who have selected or been assigned to such Participating Physician, if the applicable Plan provides for a Primary Care Physician.

12.13 <u>Proprietary Information</u>. The information developed by or belonging to Company or any third party Payor including, but not limited to, this Agreement, mailing lists, patient lists, employer lists, Company rates and procedures, product related information and structure, utilization review procedures, formats and structure and related information and documents concerning Company's systems and operations of its Plans.

12.14 <u>Specialist Services</u>. Those Covered Services to be provided to Members by Provider in the Specialty under the terms and conditions of the applicable Plan.

12.15 <u>Sponsor</u>. An entity that has contracted with Company to issue, administer, or service a Plan. Sponsors shall include, without limitation, employer groups sponsoring or offering a self-insured Plan to their employees.