# EXHIBIT C

STATE OF CALIFORNIA                                                      Dave Jones, *Insurance Commissioner*

**DEPARTMENT OF INSURANCE**

EXECUTIVE OFFICE
300 CAPITOL MALL, SUITE 1700
SACRAMENTO, CA 95814
(916) 492-3500
(916) 445-5280 (FAX)
www.insurance.ca.gov



August 1, 2018

The Honorable Jeff Sessions
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Mr. Makan Delrahim
Assistant Attorney General
Antitrust Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

        **RE:   Proposed merger of CVS Health Corporation and Aetna, Inc.**

Dear Attorney General Sessions and Assistant Attorney General Delrahim:

I am writing regarding the proposed acquisition of Aetna Inc. (Aetna) by CVS Health Pharmacy, Inc., a direct, wholly-owned subsidiary of CVS Health Corporation (CVS).  The California Department of Insurance has evaluated the effect of this proposed merger on competition in the California health insurance market and on California consumers.  This letter provides the results of that evaluation and includes evidence obtained during a hearing I held on this matter.

As California's Insurance Commissioner, I am responsible for regulating the largest insurance market in the United States where insurers collect $310 Billion annually in premiums from Californians and California businesses.  California is now the fourth largest insurance market in the world.  Increasing competition in California's insurance markets delivers important benefits to Californians.  Mergers which decrease competition are not in the interest of Californians.  Health insurers and managed care plans collect more than $122.9 billion in premium annually from Californians.[1]  As Insurance Commissioner, I closely monitor changes and proposed changes in the insurance market, such as proposed health insurer mergers or acquisitions that might directly affect California and its businesses and residents.  I also monitor and review regional, national, and international changes in the insurance markets which have collateral

---

[1] Josh Cothran, *The Private Insurance Market in California, 2013* (Cal. Health Care Found. Feb. 2015), http://www.chcf.org/publications/2015/02/data-viz-health-plans.  The California Department of Insurance regulates indemnity, Exclusive Provider Organization (EPO), and Preferred Provider Organization (PPO) coverage in California. The California Department of Managed Health Care regulates managed care organizations (health care service plans, aka HMOs).

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 2 of 14

impacts on the California insurance market. The California Department of Insurance is routinely called upon for its expertise on national insurance market and regulatory issues.

In 2016, I reviewed three proposed health insurance mergers, two of which I concluded were anti-competitive. The first merger, that of Centene and Health Net, involved a company focused on government contracts (Centene) acquiring a struggling company active in the commercial market (Health Net). I approved that acquisition after imposing stringent requirements on the combined entity to remain in the commercial market as a strengthened, viable competitor. The second proposed merger, that of Anthem and Cigna, I concluded was anti-competitive under the U.S. Department of Justice (DOJ) and Federal Trade Commission (FTC) Anti-Trust Guidelines. After an extensive legal and evidentiary hearing I formally requested that the DOJ bring an action to block the Anthem-Cigna merger.[2] The DOJ filed an action and obtained a federal district court order blocking that merger. I also concluded, after an extensive legal and evidentiary hearing, that the third proposed merger, that of Aetna and Humana, was anti-competitive and would reduce consumer choice, reduce the quality of healthcare in California, and was likely to result in increased prices. I formally requested that the DOJ sue to block the Aetna-Humana merger.[3] The DOJ sued to block this merger and obtained a federal district court order blocking the merger, which was consistent with the findings I had made regarding the anti-competitive impacts of this merger.

The three mergers of health insurers in 2016 involved horizontal mergers -- they were mergers involving competitors in the same industry. In contrast the proposed CVS-Aetna merger is predominantly a vertical merger, involving entities that do not largely directly compete with each other: a health insurer and a pharmacy benefit manager (PBM) / retail pharmacy chain which operate at different points in the health insurance and pharmaceutical supply chain or service. Vertical mergers (also called "non-horizontal" mergers) can raise competition concerns however, because if a seller owns their supplier, they may erect barriers that also make it difficult for other sellers to use that supplier. This is especially problematic if that supplier has dominant market power, which is the case here with CVS. Although this merger is predominantly a vertical one, this merger also has horizontal impacts.

The proposed CVS-Aetna merger raises a number of competitive concerns for California health insurance and healthcare consumers. CVS has a dominant footprint as a retail pharmacy chain. It also dominates the market for PBM services through its subsidiary, CVS-Caremark. As a PBM, CVS-Caremark acts as an intermediary in the drug distribution chain by negotiating prices with drug companies, and receiving rebates from them, while also establishing networks and formularies for insurers. Consolidating the retail and PBM services of CVS with a major health insurer may have an adverse effect on the ability of other health insurers to access these

---

[2] See Letter of Insurance Commissioner Dave Jones to Attorney General Loretta Lynch dated June 16, 2016 containing detailed findings of fact and law regarding anti-competitive impact of Anthem-Cigna merger,
http://cdicms.insurance.ca.gov/0400-news/0100-press-releases/2016/upload/LetterUSDOJAnthem-Cigna06-16-16.pdf

[3] See Letter of Insurance Commissioner Dave Jones to Attorney General Loretta Lynch dated June 23, 2016 containing detailed findings of fact and law regarding anti-competitive impact of Aetna-Humana merger.
http://www.insurance.ca.gov/01-consumers/110-health/60-resources/upload/Aetna-Humana-Letter-to-US-DOJ-Final-835am-signed.pdf

suppliers, hindering their ability to compete in, or enter, the California insurance market. Such anti-competitive impacts could hurt California consumers.

My Department does not have direct approval authority over this proposed acquisition because the transaction does not involve a California domestic or commercially domiciled insurance company. However, the transaction does involve an Aetna subsidiary, Aetna Life Insurance Company, which is licensed by the California Department of Insurance to sell health insurance in California, and provides coverage to more than a million Californians.

This merger poses immediate competitive concerns in California and nationwide, based on an evaluation of regional markets using the factors recited in the DOJ *Non-Horizontal Merger Guidelines*, revised April 18, 1997.[4] Similarly, the merger poses competitive concerns in the Medicare Part D market when reviewed using the factors recited in the U.S. DOJ and Federal Trade Commission's (FTC's) *Horizontal Merger Guidelines*.[5] Additionally, another significant concern is that the proposed merger of Aetna and CVS removes Aetna as a potential competitor from an already concentrated PBM market. In an era where the largest insurers increase barriers to entry by consolidating market power, the loss of a PBM entrant with the resources and expertise needed to expand into a heavily consolidated market would be a substantial loss for Californians as well as nationally.

The proposed CVS-Aetna merger would combine the country's third largest health insurer by market value with one of the country's largest PBM / pharmacy chains at a time when the national market for PBM services is already highly concentrated. In addition to removing Aetna as an important potential competitor from the PBM marketplace, the enhanced market power of a merged CVS and Aetna will have an anticompetitive effect on both California's PBM and health insurance markets, as well as an anticompetitive impact on the retail pharmacy market. The combined entity will also be able to increase barriers to other entities seeking entry into the PBM market, increase costs, decrease the quality of care provided to its members, and reduce competition in the retail pharmacy market. Accordingly, in light of the anti-competitive impacts of the proposed merger, and the fact that the alleged benefits could be achieved through other arrangements, such as contracting, I conclude that the proposed merger of CVS and Aetna is anti-competitive and recommend that the United States Department of Justice challenge this transaction.

    I.    BACKGROUND: THE CVS-AETNA MERGER HEARING

I held a public hearing regarding the proposed merger on June 19, 2018. The hearing transcript, reports of expert witnesses, and comments submitted by the companies and members of the

---

[4] U.S. Dep't of Justice *Non-Horizontal Merger Guidelines*,(originally issued as part of "U.S. Department of Justice Merger Guidelines, June 14, 1984") [hereinafter *Non-Horizontal Merger Guidelines*], *available at* https://www.justice.gov/sites/default/files/atr/legacy/2006/05/18/2614.pdf.
[5] U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (Aug. 19, 2010) [hereinafter *Horizontal Merger Guidelines*], *available at* https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 4 of 14

public are available on the website of the California Department of Insurance.[6]  Thomas M. Moriarty, Executive Vice President, Chief Policy and External Affairs Officer, and General Counsel, testified for CVS, and Kristen Miranda, California Market President and West Region Head, testified for Aetna.  Expert witnesses offered analyses of the competitive impact of the proposed mergers.  Representatives of consumers, medical providers, and community organizations also testified.  I also received written public comment.  Further, my Department and I reviewed multiple studies and published articles regarding the impact of health insurance mergers, and the CVS and Aetna merger in particular.

   II. THERE IS SUBSTANTIAL EVIDENCE THAT THE MERGER WOULD IMPAIR COMPETITION BY INCREASING MARKET CONCENTRATION AND ENHANCING CVS/AETNA'S MARKET SHARE AND MARKET POWER IN THE PBM MARKET, THEREBY ERECTING BARRIERS TO NEW ENTRANTS.

The PBM market, like the rest of the health insurance market in California and nationally, already suffers from a high degree of market concentration and limited competition.  Approximately 70% of all prescriptions are filled by one of three PBM firms: Express Scripts, Caremark (owned by CVS), and OptumRx (owned by UnitedHealth).[7]  It is difficult for new entities to enter and compete in the PBM market.  This difficulty is amplified in a large market like California.  The concentrated nature of the PBM market, the lack of a strong regulatory scheme, and the opaqueness of PBM contracts, puts consumers and direct purchasers of PBM services at a severe disadvantage.

   A. *The CVS-Aetna merger will eliminate Aetna as a potential entrant into the already highly condensed and competitive PBM market.*

By acquiring Aetna, CVS prevents Aetna from entering the PBM market as a separate competitor.  Aetna has stated publicly that it had considered entering the PBM marketplace prior to agreeing to be purchased by CVS.[8]  Aetna, as one of the nation's largest health insurers, could develop its own in-house PBM.  In fact, Aetna currently undertakes numerous important PBM services in-house, including rebate contracting with drug manufacturers for most of its commercial clients, as well as formulary development.[9]

---

[6] California Department of Insurance (CDI) Hearing transcript and materials are available at: http://www.insurance.ca.gov/01-consumers/110-health/60-resources/Aetna-CVS-Merger-Information.cfm.

[7] Amanda Starc, Associate Professor of Strategy, Kellogg School of Management, Northwestern University, *Comments on Selected Issues RE: the Proposed Mergers of Aetna and CVS,* May 15, 2018 (rev. July 3, 2018) ("Starc Report"), at 9; *citing* Fein, Adam, *The 2017 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers*, (2017) Pembroke Consulting, Inc. and Drug Channels Institute.

[8] Thomas Sabatino, *Testimony*, House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, February 27, 2018 at 40:01 of recorded testimony available here: https://judiciary.house.gov/hearing/competition-pharmaceutical-supply-chain-proposed-merger-cvs-health-aetna/.

[9] CVS Aetna Supplemental Submission to CDI July 16, 2018, http://www.insurance.ca.gov/01-consumers/110-health/60-resources/upload/CVS-Aetna-Supplemental-Submission-to-CDI-July-16-2018.pdf.

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 5 of 14

Aetna's financial statements to the SEC state that it performs the following PBM services for Aetna's pharmacy customers, including: product development, commercial formulary management, pharmacy rebate contracting and administration, sales and account management and precertification programs.[10] This demonstrates an existing proficiency and level of experience providing significant PBM services. If Aetna were to enter the PBM market and offer PBM services to others, it would provide meaningful additional competition in the PBM market.[11]

The *Non-Horizontal Merger Guidelines* point out that "the non-horizontal merger of a firm already in the market… with a potential entrant… to the market may adversely affect competition in the market."[12] Removal of a potential competitor from the market may have the effect of "harm to 'perceived potential competition.'"[13] The removal of Aetna as a potential PBM entrant eliminates a potential large competitor that would have reduced concentration in the market. When there is more competition in the market, prices tend to decrease and consumers can benefit from not only lower prescription drug prices, but, potentially, lower premiums as well if health insurers pass on drug cost savings to insureds. Additionally, in order for a PBM to be successful, it needs covered lives to negotiate volume discounts with drug manufacturers. Removal of Aetna, the third largest health insurer in the nation with more than 23 million covered lives, from the PBM market restricts the opportunities for new as well as existing PBM competitors in the market. Further, as Aetna provides its own key PBM functions in-house, given its market share in the insurance market it is also already a significant participant in the PBM market as a self-supplier; thus, the proposed merger with CVS has horizontal merger implications in the PBM market, as well.

> B. *Evidence Demonstrates that the Merger Would Put Other Health Insurers at a Competitive Disadvantage*

CVS currently provides PBM services to 94 million plan beneficiaries nationally, of which 22 million are Aetna subscribers.[14] Additionally, many of the largest PBM competitors are also owned by health insurers, such as OptumRx which has merged with UnitedHealthcare, and Cigna, which has initiated a merger with Express Scripts.

The PBM market's lack of competition and the merger of CVS-Aetna is likely to put other insurers that do not own a PBM at a disadvantage. Post-merger, as a PBM, CVS will have less incentive to keep down the cost of prescription drugs and other health care costs for other health insurers competing with Aetna. PBMs garner profits through rebates with pharmaceutical manufactures. The PBM retains a portion of these rebates and passes a portion of the remaining rebate back to the health insurer, which allows the insurer to potentially lower premium rates.

---

[10] Sood Report at 9; Aetna 10-k Report (Dec. 31, 2017), at 7, available at http://www.aetna.com/investors-aetna/assets/documents/2017/4q17-form-10k.pdf (SEC 10-k Report).
[11] Starc Report, *supra* at 12.
[12] *Non-Horizontal Merger Guidelines, supra* at 1.
https://www.justice.gov/sites/default/files/atr/legacy/2006/05/18/2614.pdf.
[13] Id.
[14] Sood Report at 10.

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 6 of 14

Post-merger, when acting in its capacity as a PBM, CVS would have less of an incentive to pass these rebates to contracted health insurers that may be in competition with Aetna. Consumers insured with those competitors could face higher premiums as a result.

The risk that CVS would have less of an incentive to pass on rebates or provide services to competing health insurers increases the risk of "vertical foreclosure." Vertical foreclosure occurs when a newly integrated distributor stops selling products to a downstream firm's rivals, or increases the rival's costs, such as if CVS refuses to contract with health insurers or increases the cost of prescription drugs to other health insurers.[15] Vertical foreclosure increases antitrust concerns because a rival health insurer could be excluded from the market or forced to pay higher costs. Such risks are increased in a concentrated market like the current PBM market where an insurer has only two other large PBM firms to choose from, one of which is already owned by another health insurer (OptumRX – UnitedHealth).

Professor Neeraj Sood[16] analyzed whether CVS-Aetna would have a financial incentive to place competing health insurers that contract with the combined entity's PBM at a disadvantage, and risk losing those PBM customers, in order to gain insurance customers. Professor Sood found that if CVS-Aetna, post-merger, lost a PBM customer it would equate to approximately $23 in lost profits. However, a gain by CVS-Aetna of a health insurance consumer would result in approximately $323 in profits. This results in a single insurance consumer being as valuable as fourteen PBM consumers, thus providing a strong incentive for CVS-Aetna to disadvantage competing health insurers in its PBM practices.[17]

The PBM market is largely unregulated, resulting in an opaque pricing and rebate structure that gives both the pharmaceutical manufacturer and the PBM incentives to allow higher prices and higher rebates, therefore increasing the risk of vertical foreclosure. Although CVS states that it currently passes along more than 90 percent of its overall rebates to clients, they provided no evidence of anything that would prohibit them from changing this practice post-merger.[18]

> C.  *The CVS-Aetna merger will result in a need for two-level entry into the PBM and health insurance market.*

The CVS-Aetna merger will make it much more difficult to enter the PBM market unless the PBM is able to simultaneously enter, or is already in, the health insurance market. The *Non-Horizontal Guidelines* note that this "need for simultaneous entry to the secondary market gives rise to substantial incremental difficulty as compared to entry into the primary market alone."[19] The cost for such entrance, including the process of building a provider network and securing sufficient covered lives, is extremely high and likely to create a bar to those smaller entities that previously may have been able to enter the PBM market only. Expert witnesses at the June 19,

---

[15] Starc Report at 10.
[16] Neeraj Sood, Ph.D., Professor of Public Policy, Sol Price School of Public Policy, University of Southern California.
[17] Sood Report at 11-12.
[18] CVS-Aetna July 3, 2018 letter at 2.
[19] *Non-Horizontal Merger Guidelines, supra* at 27.

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 7 of 14

2018 hearing stated that new entrants to the PBM market would be required to have the capabilities to be a payer and PBM in order to compete in the PBM market after the CVS-Aetna merger.[20]  This additional burden on entry into the PBM market will only further stifle competition. [21]

Additionally, in Aetna's SEC 10-K Report, it states that "other suppliers also provide certain [PBM] services" to Aetna.[22]  If, post-merger, Aetna transfers this business to CVS it will only further diminish the ability of new entrants to enter the PBM market if the opportunity to bid and contract to provide these services is removed from the market.

        D.   *The CVS-Aetna merger will harm independent retail pharmacies.*

Much like the PBM market, the pharmacy markets nationally are "uncompetitive or highly concentrated."[23]  In their supplemental letter, CVS Health argued that their pharmacy share "in California is 21.3% and nationally is 16.2%."[24]  While significant itself, this nationwide and California market share obscures the market dominance of CVS in specific regions.  In filings with the Securities and Exchange Commission, CVS Health states "[w]e currently operate in 98 of the top 100 United State drugstore markets and hold the number one or number two market share in 93 of those markets."[25]  In 14 of the country's largest metro-areas, CVS and Walgreens, together, control 50 to 75 percent of the drugstore market.[26]  Research suggests that drug prices consumers pay at pharmacies in a single local market may vary widely for the same product, but that drug prices found at independent pharmacies and online discount websites were lower on average than prices at chain drug stores, such as CVS.[27]  Consumers, then, are arguably better served when there is not only a competitive market, but when that market includes independent pharmacies and online discount websites to fill prescriptions in addition to large retail pharmacies.  The CVS-Aetna merger will only serve to increase CVS's dominance in the pharmacy market and will likely increase overall prescription drug prices for consumers.[28]

In addition, CVS-Aetna could disadvantage other retail pharmacies by creating cost-sharing structures that incentivize insureds to seek services from CVS over their competitors.  During our hearing, representatives from Aetna stated that they "certainly don't have any plans to modify cost sharing for CVS versus non-CVS retail pharmacies"[29] to accomplish this.  However,

---

[20] Starc Report, *supra* at 11; Sood report, *supra* at 16.
[21] Report of Professor Thomas L. Greaney, University of California Hastings College of Law, June 19, 2018 at 6, http://www.insurance.ca.gov/01-consumers/110-health/60-resources/upload/Greaney-Statement-to-CA-Department-of-Insurance-6-19-18.pdf
[22] SEC 10-k Report, *supra* at 7.
[23] Sood Report, *supra* at 13.
[24] CVS Aetna Supplemental Submission to CDI July 3, 2018, at 3 http://www.insurance.ca.gov/01-consumers/110-health/60-resources/upload/CVS-Aetna-Supplemental-Submission-to-CDI-July-3-2018.PDF.
[25] SEC 10-k Report, *supra* at 6.
[26] Sood Report, *supra* at 13
[27] Sood Report, *supra* at 6.
[28] Sood Report, *supra* at 14.
[29] Testimony of Kristen Miranda, California Market President & West Region Head, Aetna, CDI Transcript, *supra*, at 63:15-20.

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 8 of 14

this vague response is far less than a binding affirmative commitment not to engage in anticompetitive behavior which could drive small, independent pharmacies out of business or result in CVS purchasing them, thus further concentrating the retail pharmacy market. Similarly, in addition to cost-sharing, the combined entity could engage in other anticompetitive conduct, such as giving preferential display to CVS pharmacies in price-comparison websites, or by Aetna providing preference to CVS pharmacies in network designs.[30]

> E. *The Market Dominance of CVS in Specialty Pharmacy, in Combination with Aetna, Would Provide Market Power That Promotes Anti-Competitive Practices That Negatively Affect Patient Care*

CVS Specialty, a subsidiary of CVS Health, is the largest specialty pharmacy in the nation.[31] Three of the largest specialty pharmacies, owned by CVS Health, Walgreens Boots Alliance, and Express Scripts, account for 60% of all specialty prescription revenues.[32] CVS has a 25% specialty prescription market share by revenues.[33] Specialty pharmacies are a source of medications for patients with complex, serious conditions, such as cancer, cystic fibrosis, and HIV/AIDS; certain of these drugs (such as chemotherapy drugs) may, however, also be available from a treating physician.[34] Specialty pharmacies are a significant source of revenue growth.[35] Because of the highly attractive potential for increased revenues, the combined CVS-Aetna entity will have strong incentives to steer insured persons, through such mechanisms as using preferential cost-sharing arrangements, towards CVS Specialty for specialty drugs, and financially penalize consumers for obtaining the specialty drug from their treating physician. This financial penalty fragments care by removing the oversight of the treating physician, which impairs monitoring of the course of treatment. This is of particular significance for chemotherapy treatments.[36]

> III. THE MERGER WILL HAVE HORIZONTAL ANTICOMPETITIVE IMPACTS ON THE MEDICARE PART D MARKET.
>
> A. *Analysis of HHI Demonstrates that the Merger Would Significantly Increase Concentration in the Medicare Part D Market.*

Although the merger has been described as a vertical merger and the preceding analysis focuses on the potential anti-competitive impacts of the vertical merger, the CVS-Aetna merger also presents horizontal merger implications. Both CVS and Aetna participate in the Medicare Part D (Part D) prescription drug plan market. In 2018, 25 million people nationally and 2.3 million in

---

[30] Sood report, *supra* at 13-14.
[31] CVS Health 2017 Annual Report, at 10: http://investors.cvshealth.com/~/media/Files/C/CVS-IR-v3/reports/cvs-ar-2017.pdf.
[32] Starc report, *supra* at 10.
[33] "The Top 15 Specialty Pharmacies of 2017: PBMs and Payers Still Dominate" Drug Channels, March 13, 2018, https://www.drugchannels.net/2018/03/the-top-15-specialty-pharmacies-of-2017.html.
[34] Starc Repot, *supra* at 13.
[35] Testimony of Barbara McAneny, M.D., CDI Transcript, *supra*, at 180:15-16.
[36] Id. at 181:22-25.

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 9 of 14

California are covered under a Part D prescription drug plan.[37]  Nationally, Aetna has a 9% market share among Part D plans while CVS Health has a 24% market share, with even greater overlap in some geographic markets.  Economic evidence suggests that increasing the market concentration and reducing competition for Part D plans will likely result in higher premiums.[38]  In some states, the combined Part D market share of CVS and Aetna is even greater-- in Connecticut, CVS has a 30.1 percent share of Part D enrollees and Aetna's share is 7.6 percent in that state.

Professor Richard M. Scheffler of the U.C. Berkeley School of Public Health analyzed the 34 Part D regions for overlap in the standalone prescription drug plans (PDP) that provide coverage to Medicare recipients (distinguished from Medicare Advantage Prescription Drug Plans (MAPDP)).  Dr. Scheffler used the Herfindahl-Hirschman Index (HHI) to measure the PDP market concentration, in accordance with the *Horizontal Merger Guidelines*.  To determine the HHI, Dr. Scheffler calculated market concentration using two different assumptions 1) premerger HHI, with CVS and Aetna operating as separate firms; and 2) post-merger HHI, where CVS and Aetna operate as a single firm.  Additionally, market concentration measures from 2009 to 2017 were calculated to show the trend in the PDP market.

Professor Scheffler concluded that the CVS/Aetna post-merger HHIs and HHI increases would result in determinations of "presumed likely to enhance market power" or "potentially raise significant competitive concerns and often warrant scrutiny" in a large number of counties for each of these markets, as defined in the *Horizontal Merger Guidelines*, as follows:

1. Market Concentration Trends and Post-Merger HHI:

    a. The national PDP market would become moderately concentrated (HHI of between 1,500 and 2,500) with an HHI increase over 400, and thus the merger would "potentially raise significant competitive concerns and often warrant scrutiny."

    b. The California PDP market would become moderately concentrated (HHI of between 1,500 and 2,500) with an HHI increase 434 points, and thus the merger would "potentially raise significant competitive concerns and often warrant scrutiny."

These HHI and HHI increase levels, together with relatively high entry barriers, increase the oligopolistic nature of these markets and raise a reasonable probability of coordinated anticompetitive conduct by market participants.

CVS and Aetna representatives, both at our June 19th hearing and in a supplemental submission, assert that there is ample competition in the Part D market, because the PDP market also competes with MAPDP.  I find this assertion unpersuasive and not supported by the weight of evidence.  Instead, I agree with the court in *United States v. Aetna Inc.*, 240 F.Supp.3d 1, 20, 42

---

[37] AMA report, *supra* at 2.
[38] Starc report, *supra* at 3.

(D.D.C. 2017), that there is very little consumer movement between MAPDP and PDP plans in response to price increases. Other studies have also shown that most Medicare enrollees tend to stick with their original plan of choice, even when they are faced with relatively large premium increases.[39] It is true that there are ten competitors in the PDP market in California, but this merger would result in just three competitors controlling 83% of the market,[40] a significant concentration of the market with likely anti-competitive impacts.

IV. CVS AND AETNA HAVE PROVIDED NO RELIABLE EVIDENCE DISPROVING THE LIKELY HARMS FROM THE MERGER, OR INDICATING THAT THE ASSERTED EFFICIENCIES OR CONSUMER BENEFITS WOULD COUNTERACT THE HARM TO COMPETITION

A. *The Companies Have Neither Provided Reliable Evidence of Claimed Efficiencies, Nor Reliable Evidence that Efficiency Savings Will Be Passed on to Consumers.*

The *Horizontal Merger Guidelines* note that "[e]fficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means" or if the efficiencies could be achieved unilaterally or by collaborative means short of a merger.[41] When the parties fail to present persuasive evidence about a merger's benefits, such as actual efficiencies, one can infer that evidence is lacking.

In testimony at our hearing, CVS asserted that the proposed acquisition would result in $750 million dollars of savings from reduced marketing, as well as general and administrative expenses. At the hearing, I asked representatives of both CVS and Aetna for greater detail on how these savings would be generated and what percentage of these savings would be passed on to consumers. They were unable to provide an estimate.[42]

> Commissioner Jones: Let me ask specifically, will the entirety of the $750 million be allocated to reductions in premium or decreases in the rate of increase of premium for the merged entity?
>
> Mr. Moriarty *[Executive Vice President, Chief Policy and External Affairs Officer, General Counsel, CVS Health]*: I can't say, Commissioner, what percentage will. There will certainly be some. There obviously are investments that need to be made in systems and other programs to drive these longer term, and you'll see a component of that reinvested into the business as well to improve the services and develop better programs as we go forward.

---

[39] *To Switch or Not to Switch: Are Medicare Beneficiaries Switching Drug Plans To Save Money?* October 10, 2013, Kaiser Family Foundation, available at: https://www.kff.org/medicare/issue-brief/to-switch-or-not-to-switch-are-medicare-beneficiaries-switching-drug-plans-to-save-money/.
[40] Based on April 2018 CMS plan enrollment data.
[41] *Horizontal Merger Guidelines*, *supra,* at 30.
[42] CDI Hearing Transcript, 13:12-4, 16-19, 50:13-51:1, 51:14-51:19

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 11 of 14

> …
>
> Commissioner Jones: Can Aetna give me any estimate of the portion of the $750 million a year that can be allocated to premium reductions or decreases in the increase in premium?
>
> Mr. Wingle *[Vice President for Operations, Product, and Technology, Aetna.]*: I don't have that information available at this time.

Similarly, in the two supplemental responses provided by the companies after the hearing, the companies were unable to quantify the estimated premium reduction anticipated as a result of the alleged efficiencies resulting from the merger.[43] This alleged benefit should be considered speculative in any weighing of benefits against anticompetitive impacts.

Professor Sood noted that "[p]ost-merger CVS would have a stronger incentive to control prescription drug costs… and overall health care costs for Aetna."[44] This is in comparison to the current assumption that, as a PBM, CVS does not have as strong an incentive to negotiate greater savings on behalf of health insurers. Post-merger "CVS would have reduced incentives to engage in practices that increase rebates at the cost of increasing spending on prescription drugs for Aetna."[45] However, as Professor Sood points out, the estimated savings and increased efficiencies touted by CVS-Aetna only occur if Aetna is not already providing its own core PBM services including strategic decisions on formulary design and price negotiations with pharmaceutical companies.[46] Currently, it appears that Aetna already performs its own core PBM services including product development, formulary management, pharmacy rebate contracting and administration, sales and account management, and precertification programs. As Aetna already performs its core PBM functions, the potential efficiencies from merging with the PBM arm of CVS would be minimal."[47]

Additionally, Professor Lawton Burns[48] and others noted that healthcare related mergers, including non-horizontal mergers, result in price increases, not price decreases.[49] An increase in market power does not necessarily result in savings being passed on to consumers.

      B.   *Neither CVS nor Aetna Have Provided Reliable Evidence that Quality Will Improve*

At our hearing, CVS and Aetna's representatives only spoke in generalities about quality improvement. As noted above, academic experts on health insurer mergers find that in an

---

[43] CVS-Aetna Supplemental Submissions to CDI on July 3, 2018, at 2-3, July 16, 2018, *supra.*
[44] Sood Report, *supra* at 8.
[45] Sood Report, *supra* at 8.
[46] Sood Report, *supra* at 9.
[47] Sood Report *supra* at 9.
[48] Lawton Burns, Ph.D., MBA, James Joo-Jin Kim Professor, Department of Health Care Management, The Wharton School, University of Pennsylvania.
[49] Burns Report, *supra* at 7.

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 12 of 14

oligopsony, quality usually decreases when there are so few competitors that they lack an incentive to compete to attract or retain customers by improving quality.

      C.    *The CVS-Aetna merger will not benefit consumers*

PBMs act as intermediaries between drug manufacturers, employers, and health insurers. PBMs earn profits by selling prescription drugs at a markup to self-insured employers and health insurers. Arguably, the CVS-Aetna merger could drive down prescription drug costs because CVS would have an incentive to negotiate lower drug prices on behalf of Aetna, which could assist Aetna in lowering premiums. However, problematically, CVS and Aetna representatives would not commit to lowering premiums. Instead, they cite only to the "synergies" created by the merger which will result in cost savings to Aetna insureds, invoking the UnitedHealth – OptumRx merger as an example. CVS and Aetna state that UnitedHealth – OptumRx merger created "overall savings of $11-16 per member per month" and CVS expects that their merger would "yield hundreds of millions of dollars in medical cost savings, which <u>could</u> be passed on to consumers in the form of lower health premiums."[50] However, despite these savings, CVS-Aetna continues to refuse to commit to pass these savings on to consumers in the form of reduced premiums.

The "synergies" cited by CVS as benefiting consumers include: improving chronic care management, shifting care to lower-cost and more convenient sites, earlier and more effective medical interventions, and increased medication adherence. CVS relies on these methods as potential cost savings to consumers, by reducing the cost of site of care (by, for example, offering MinuteClinic visits rather than a doctor or urgent care visit) as well as number of occurrences (lower copays if visits are reduced). While such cost reductions may occur, it is more likely to affect a smaller number of high-frequency users. A reduction in premiums (that Aetna and CVS will not commit to) would help Aetna consumers across the spectrum. Further, as detailed in the testimony and report of Professor Burns, the purported benefits of the proposed merger's focus on clinics based in retail pharmacies do not outweigh the risks of fragmentation of care, reduction in care coordination by primary care providers, and avoidance of underserved populations, including persons with complex, chronic conditions.[51] The asserted benefits and efficiencies, if any, of a combination of clinic-pharmacy-and-insurer arise from a level of integration that can be obtained through contracting, without triggering the competitive concerns arising from this merger.

      D.    *Divestitures Will Not Fully Restore Competition or Adequately Protect Californians.*

As to the horizontal aspects of this merger, divestiture of some portion of either or both companies or undertakings as to rates, quality, or investments will not remedy or sufficiently mitigate the anticompetitive impacts and results of this merger.[52] Further, once a merger is completed and consumers and competitors begin to experience the negative impact of the

---

[50] CVS-Aetna Supplemental Submission to CDI, July 3, 2018, *supra* at 3 (emphasis added).
[51] Burns Report, *supra* at 8-22.
[52] *Horizontal Merger Guidelines*, *supra, s*ection 10.

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 13 of 14

merger, it will be too late to effectively mitigate these adverse outcomes. The law requires that any remedies fully restore competition. The necessary divestitures in the markets would be close to impossible to accomplish given the number and scale of the impacted areas. Additionally, divestiture to a company with an already significant market share would not remedy the competitive situation, and divestiture to a new entrant would likely fail in short order. A retrospective analysis of mergers indicates that even smaller divestitures fail to achieve the desired pro-competitive goals.[53]

## V. REGULATORY EXPERIENCE WITH AETNA URGES CAUTION

In testimony during the hearing, CVS and Aetna represented that the combined entity would implement safeguards that will prevent anticompetitive conduct after the merger. However, my Department's regulatory experience with Aetna Life Insurance Company is instructive, in that compliance with legal requirements cannot be assumed to occur in the absence of oversight. For example, the Department's most recent publicly available market conduct examination of Aetna Life Insurance Company indicated a persisting trend of likely violations[54] relating to Aetna's claims handling procedures and practices. This exam found numerous alleged violations, including improper representation of pertinent facts and policy provisions to claimants, incorrect denials, unsatisfactory settlements, failure to inform the insured of the right to independent medical review, and failure to conduct fair investigation of claims. The exam also found violations related to claims handling, including but not limited to failure to conduct a thorough investigation, and failure to provide clear reasons for denial of claims.[55]

Similarly, in recent years, Aetna Life Insurance Company's proposed prescription drug formularies, compared with those of other insurers, have been among the most restrictive in terms of coverage, with Aetna Life Insurance Company placing drugs vital to treating chronic conditions on high-cost tiers and subjecting insureds to excessive utilization management, and raising significant concerns regarding discriminatory formulary and plan designs that would discourage the enrollment of consumers with certain health conditions. My Department found that over half of the covered drugs for the treatment of opioid dependence, and opioid reversal agents, were placed on inappropriately high cost tiers in Aetna Life Insurance Company's proposed formularies. Similar inappropriate placement, as well as inappropriate prior authorization and specialty pharmacy restrictions, were seen for drugs used in HIV treatment. Resolution of these instances of inappropriate placement required regulatory intervention by my Department.

---

[53] John Kwoka, Merger Control, and Remedies: A Retrospective Analysis of U.S. Policy (MIT Press 2015).

[54] Department examiners determined these violations based on a review of documentation provided in the course of performing market conduct examinations. The violations, however, are technically "alleged violations" because they have not undergone a formal administrative or judicial process.

[55] Further caution in the review of this merger is merited as this month another state insurance regulator issued an order of penalty against the CVS Caremark PBM operation, with a fine of over $1.5 million, for repeated violations related to claim denials. http://insurance.ky.gov/Documents/CVS%20Caremark%20Order%20-%20Press%20Release.pdf

Attorney General Sessions and Assistant Attorney General Delrahim
August 1, 2018
Page 14 of 14

Many of the concerns regarding anticompetitive conduct, such as information exchange, price differentials, and consumer steering, would be difficult to unwind after such a merger goes forward.  Therefore, my Department's regulatory experience with one of the entities should be considered to be cautionary: promises of legal compliance are not necessarily self-executing.

## VI.   CONCLUSION

The proposed merger of CVS and Aetna will significantly reduce competition in the PBM and Medicare Part D markets, affecting millions of health care consumers throughout the country.  Applying the analysis typically used by the United States Department of Justice and the Federal Trade Commission, the merger will substantially enhance market concentration and power in these markets.  A merger of this size and type, according to experts on health insurer and health care mergers, will likely lead to increased prices and decreased quality.

Further, partial divestiture or other remedies traditionally used by the Department of Justice will not adequately protect consumers or address the adverse consequences of a merger of CVS and Aetna.  Traditional methods to avoid market concentration will not address potential impacts on service quality, the power to charge excessive rates, or the creation of barriers to block a potential market participant with the resources to enter into new markets.

Finally, the CVS-Aetna merger will eliminate Aetna as an important potential competitor in the PBM market.  In the present health insurance and health care markets, it is impossible to create *de novo* a PBM competitor with the strength, experience, and provider relationships that Aetna has established. Loss of Aetna as a potential competitor in the PBM market is an irreplaceable loss of competition because of the extraordinary concentration of the PBM market and high barriers to entry.  If there are any other entities considering entry into the PBM market, they will now have to enter the market in conjunction with a health insurer.  Single entry PBMs will no longer be feasible to compete with these behemoths.

For these reasons, I conclude that the proposed merger of CVS and Aetna will have anti-competitive effects and not be in the interest of consumers or health insurance and healthcare markets in California and nationally.  The CVS and Aetna merger will harm Californians and our health insurance market, and is likely to increase drug prices for consumers rather than reduce them.  The CVS and Aetna merger will harm consumers in markets across the United States.  Accordingly, I request that the United States Department of Justice sue to block the CVS-Aetna merger.

Sincerely,

*[signature: Dave Jones]*

DAVE JONES
California Insurance Commissioner