# EXHIBIT D

**ConsumersUnion**
POLICY & ACTION FROM CONSUMER REPORTS

# STATEMENT OF GEORGE SLOVER
# SENIOR POLICY COUNSEL
# CONSUMERS UNION

# BEFORE THE

# SUBCOMMITTEE ON REGULATORY REFORM,
# COMMERCIAL AND ANTITRUST LAW
# HOUSE COMMITTEE ON THE JUDICIARY

# ON

# COMPETITION IN THE PHARMACEUTICAL
# SUPPLY CHAIN: THE PROPOSED MERGER
# OF CVS HEALTH AND AETNA

**February 27, 2018**

Chairman Marino, Ranking Member Cicilline, Subcommittee Members, thank you for the opportunity to be here today, to discuss the proposed merger of CVS Health and Aetna, and its potential impacts on the health care marketplace, and on consumers in particular. And thank you for your continuing focus on making the prescription drug marketplace work better for consumers.

Consumers Union is the advocacy division of Consumer Reports.[1] Our mission is to work for a fair, just, and safe marketplace for all consumers, and to empower consumers to protect themselves. And one key to empowering consumers to protect themselves is working to ensure meaningful consumer choice, through effective competition.

By meaningful choice, we mean choice that is easy for consumers to understand and compare, and responsive to what's important to consumers. When consumers have meaningful choice, businesses are motivated to provide more affordability, better quality, and new thinking, in response to consumers' wants and needs.

From our founding over 80 years ago, one of our top priorities has been to make quality health care available and affordable for all Americans.

For many consumers, one of the biggest costs they face is for prescription drugs. As part of our work to help consumers reduce that cost, in 2004 we launched Consumer Reports Best Buy Drugs. This program uses evidence-based, systematic reviews of prescription drugs to verify the efficacy and safety of commonly used medicines in over 30 categories, and then combines this information with reliable cost information, helping consumers identify the "best buy."[2]

Best Buy Drugs has also conducted important market research, such as the nationally representative survey of 2000 consumers reported in an August 2016 Consumer Reports article, "Is There a Cure for High Drug Prices?"[3] The survey confirmed that high prescription drug prices are taking a serious toll, leading many consumers to split or skip doses, or to not fill the prescription at all, or to keep using a medication well after its expiration date.

---

[1] Consumers Union is the policy and mobilization division of Consumer Reports, an expert, independent, non-profit organization whose mission is to work for a fair, just, and safe marketplace for all consumers and to empower consumers to protect themselves. Consumers Union works for pro-consumer policies in the areas of antitrust and competition policy, health care, food and product safety, transportation, financial services, telecommunications and technology, privacy and data security, and other consumer issues, in Washington, D.C., in the states, and in the marketplace. Consumer Reports is the world's largest independent product-testing organization, using its dozens of labs, auto test center, and survey research department to rate thousands of products and services annually. Founded in 1936, Consumer Reports has over 7 million subscribers to its magazine, website, and other publications.

[2] http://www.consumerreports.org/health/best-buy-drugs/index.htm. Note: We do not do cost-effectiveness analysis. Instead, we present price and cost data alongside the effectiveness, safety, and side-effect data. And then we let consumers – in consultation with their doctors – interpret and adapt these data according to individual preferences, clinical circumstances, and priorities – including their budgets.

[3] https://www.consumerreports.org/drugs/cure-for-high-drug-prices/.

One key piece of advice we give consumers for navigating the prescription drugs marketplace, expressed in the title of an article in our December 2017 issue, is that "to get the lowest drug prices, it pays to shop around."[4]  But shopping around only works when it offers consumers meaningful choice.

As of December, as our research demonstrated, it does.  But unchecked consolidation could change that.

Consumers ultimately benefit from there being competition, and meaningful choice, in all parts and all levels of the healthcare marketplace.  This is a very complex marketplace, because in most instances, the prices charged for providing a consumer's healthcare products and services aren't directly and openly paid by the consumer.  And the ways that costs are negotiated and shifted among the various commercial actors in the healthcare industry are often obscured from the consumer.  For that reason, it is all the more important that there be competitive market forces at work to discipline these actors' profit-maximizing incentives, to make sure the marketplace works effectively for consumers.

We have watched with concern as the healthcare industry has grown ever-more concentrated over recent years.

Consumers Union supports active antitrust enforcement to promote and preserve competition in all parts of the healthcare marketplace.  We've supported antitrust enforcement actions against mergers involving hospitals, involving medical practices, involving health insurers, involving pharmaceutical manufacturers.  We've supported antitrust action, and legislation, to stop brand-name pharmaceutical companies from using anticompetitive tactics to block or slow the development and market entry of affordable generic alternatives.

We've also called for greater transparency from pharmacy benefit managers, or PBMs – now a highly concentrated sector – in their dealings with health plans and pharmacies, as to their true costs and markups, including the rebates and other side agreements they have negotiated on the back end with drug makers.

A merger between CVS and Aetna would have a major impact in every one of these parts of the health care marketplace.  CVS is the second largest retail pharmacy chain, with over 20 percent market share, and almost 10,000 retail locations.  It has the largest PBM, CVS Caremark, with over 25 percent market share.  It also runs more than 1000 Minute Clinics nationwide.  It earned $177 billion in revenues last year.

---

[4] https://www.consumerreports.org/drug-prices/to-get-the-lowest-drug-prices-it-pays-to-shop-around/.

Aetna is the third largest health insurer, by some measures, with over 23 million subscribers in 2016. It deals directly with hospitals, medical practices, and pharmacies from coast to coast. It earned $63 billion in revenues last year. CVS is paying almost $70 billion to buy it.

Combining these two giants would create an even bigger giant, and perhaps more importantly, would combine them into a new corporate structure, straddling more market sectors and creating new and potentially far-reaching profit-maximizing incentives, so that what before did not make business sense for them separately, now does make sense for them as a combined enterprise. To the extent those new incentives drive the combined company to integrate its resources in new ways to bring costs down and improve the quality of services – what antitrust refers to as "efficiencies" – that can be good for consumers, and good for the overall economy.

And that's the picture CVS and Aetna are painting for Members of this Subcommittee, and for the lawyers and economists at the Justice Department's Antitrust Division who are investigating this proposed merger. And some or conceivably even most of that picture might prove to be accurate.

For example, encouraging Aetna policyholders to go to a CVS Minute Clinic for simple routine care in appropriate cases, instead of to a hospital emergency room, will cut expenses for Aetna. If Aetna saves, maybe those savings might show up in lower premiums or co-pays. And if an Aetna policyholder's employer pays lower premiums, maybe those savings might even show up in a salary increase for the policyholder.

But it's by no means certain that any savings would be passed along, in any of those ways. One key factor is whether there is enough transparency and competition so that the one on the receiving end not only has the awareness of the savings upstream, but also has some realistic ability to insist on a share or to go elsewhere. That would seem unlikely in the healthcare marketplace we currently have in this country.

Furthermore, efficiencies – which companies proposing to merge will always claim – often ultimately are shown, on further examination, to be unsubstantiated, or exaggerated. And importantly for a merger investigation, even the genuine efficiencies can very often be achieved without merging, achieved through arm's-length contract arrangements. In our CVS Minute Clinic example, why does Aetna need a merger to encourage its policyholders to go to a Minute Clinic in an appropriate case instead of to a hospital emergency room?

Moreover, sometimes what are loosely described as efficiencies are revealed, on closer inspection, to involve reducing competition, in ways that harm consumer choice and harm quality. For example, CVS-Aetna might decide to tell Aetna policyholders that their coverage only applies if they go to a CVS Minute Clinic, not to a perhaps better, and equally or more affordable, and more conveniently located, walk-in clinic run by someone else. Or to tell them that they get full coverage

only for the Minute Clinic, because it's "in-network," with in-network now meaning it has to be in-house.  Or to tell independent clinics who want to be in the CVS network that they must kick back profits, or must cut corners on quality of service, in order to meet new "guidelines."

Similarly, CVS-Aetna might now find it to its advantage to steer as many Aetna policyholders as it can into using CVS to fill their prescriptions.  Or to steer them into using CVS Minute Clinics for more of their medical needs, and away from their own primary care physicians – even though the primary care physicians have established relationships with the policyholders and can provide better continuity of care.

Or CVS-Aetna might find it to its advantage for CVS Caremark to negotiate different, better deals on prescription drugs only for those who pay with Aetna insurance, or only for those who fill them at CVS.  Because of the black box surrounding PBM rebates and side agreements, this area is particularly vulnerable to anticompetitive abuse.

And these are just a few of the ways in which CVS-Aetna might find it profitable to use its combined resources to make it harder for its rivals to get what they need, or harder for them to reach consumers, or to otherwise interfere in their efforts to compete effectively.

CVS and Aetna insist that they would never do any of those things, that their goals will always be focused on serving as many as they can, as well as they can, as often as they can.  But this is not about what their present intentions might be.  It is about how their incentives and capabilities would be altered by the new market-straddling corporate structure that the merger would create, and whether this would lead to improved products and services, or would lead to restricted competition and choice, and to poorer products and services.

An independent Aetna would want to encourage its policyholders to use a Minute Clinic in an appropriate case instead of a more expensive emergency room, naturally.  But it would also be fine with its policyholders choosing an equally affordable walk-in clinic run by someone else.  In fact, that other clinic might be more convenient and familiar to the policyholder, and therefore more likely to be used when appropriate.

But an Aetna merged with CVS would see a trade-off.  Every Aetna policyholder who comes to the Minute Clinic brings profits to the merged company.  Every Aetna policyholder who goes somewhere else means profits forgone.  For the Aetna with no Minute Clinic affiliate, the incentive to discriminate among equivalent clinics is zero.  For the Aetna joined with Minute Clinic, the incentive is higher.  CVS-Aetna may still be willing to do business with those other clinics, but the terms it wants will change.  The line as to where CVS-Aetna can take optimum profit-maximizing advantage, to have its cake and eat it too, will shift.  And consumers could find that these other, more convenient and familiar clinics are off-limits, or that they will have to pay more to use them.

Exactly how that line would shift is the stuff of which antitrust investigations are made. It will become more apparent to the lawyers and economists in the Justice Department's Antitrust Division after their careful analysis of detailed facts, many of which are going to remain unknown to those of us who don't have access to the confidential information they will be privy to – unless and until those facts are used as evidence at trial.

By the time they are finished, the lawyers and economists will know where all those other clinics are, and where the medical practices are, and the hospital emergency rooms, and other facilities, that consumers might want and need as choices, and how all those facilities would be impacted by the merged company's altered profit-maximizing incentives. They will have insight into all the details about how CVS Caremark interacts with all of the health plans, not just Aetna but also the ones that compete with Aetna, and how it interacts with pharmacies other than CVS. They will know about the rebates and side agreements CVS Caremark has negotiated with the pharmaceutical companies. They will be able to examine all factors that play into the effects on competition and choice, as those effects vary with the particulars of each affected location.

This kind of merger is often referred to as a vertical merger, because, for the most part, CVS and Aetna do not currently compete with each other, they deal with each other. It is sometimes said that vertical mergers cannot raise competition concerns, that harm to competition can only result when the merger is horizontal, between two companies that currently compete directly with each other, or that are on the verge of doing so.

But this is not accurate. The concerns I am describing are squarely within established antitrust law. There was a time, 30 or 40 years ago, when the harms that could result from a vertical merger were tending to be dismissed by many antitrust scholars, and by the antitrust enforcement agencies and the courts. That was part of what was then considered the "new thinking." But our understanding has evolved and deepened since then, and there is now greater recognition of how a company operating at two levels in the supply and marketing chain, if it has enough market power at one level, can arrange its dealings with the other level in that chain to favor itself at that other level, such as in the Minute Clinic example I described. And if the rivals at that other level don't have meaningful options, that translates into less choice at all levels up and down the chain – including, ultimately, less choice for consumers.

Meaningful choice for consumers depends on meaningful choice at all market levels.

The Justice Department has recently brought enforcement action to challenge the proposed merger of AT&T and Time Warner, based on very similar kinds of concerns about harm to competition that would result from that vertical merger.

5

Finally, there *is* also a horizontal dimension to this merger investigation. One of the attractions of this merger to Aetna is that it would get its own in-house PBM, in CVS Caremark. But it doesn't need a merger to get one, that's just a shortcut route. If this merger is challenged and doesn't go through, Aetna is in a very good position to establish its own in-house PBM. And that would add some much-needed competition to this highly concentrated market sector. The Department will also be taking that prospect into consideration.

We do not prejudge the outcome of the investigation now underway. But we hope and expect the investigation to be thorough. And at its conclusion, we are counting on the Department to take whatever enforcement action is warranted to ensure that consumers can benefit from a healthy dose of competition in the healthcare marketplace. That could potentially even require a full challenge to the merger, as is occurring with AT&T/ Time Warner. Or there could be steps short of stopping the merger that the Department determines would be enough to avert the harms to competition and choice that would otherwise result.

But I would caution against thinking that genuine risks to competition can be taken care of with pledges of good behavior. As Assistant Attorney General Makan Delrahim recently noted[5] – and he was far from the first[6] – using behavioral requirements to fix concerns with a merger unrealistically depends on the merged company making *daily* business decisions that run counter to its profit-maximizing incentives. That's why, as AAG Delrahim has re-confirmed, behavioral remedies are disfavored in antitrust enforcement.

Given the size of this merger, and the magnitude of the stakes involved, if the Department ultimately concludes not to challenge this merger, we will want to know why. The Department has discretion to explain decisions not to take enforcement action, and this is the kind of case in which an explanation is called for. Of course, if the Department brings an enforcement action, there will be a full explanation in the court filings.

Thank you again for the opportunity to discuss this merger, and its importance to consumers.

---

[5] https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-keynote-address-american-bar.
[6] E.g., Behavioral Merger Remedies: Evaluation and Implications for Antitrust Enforcement, John E. Kwoka and Diana L. Moss, American Antitrust Institute, Nov. 2011, at 5-6, http://www.antitrustinstitute.org/content/aai-releases-white-paper-behavioral-merger-remedies-evaluation-and-implications-antitrust-en.