# EXHIBIT E



**JAMES L. MADARA, MD**
EXECUTIVE VICE PRESIDENT, CEO

ama-assn.org
t  (312) 464-5000

August 7, 2018

The Honorable Makan Delrahim
Assistant Attorney General
United States Department of Justice Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

**RE: The Acquisition of Aetna, Inc. by CVS Health Corporation**

Dear Assistant Attorney General Delrahim:

The American Medical Association (AMA) has long had the concern that market concentration is a leading cause of high costs in health care. We thank the U.S. Department of Justice (DOJ) for devoting resources to the health care sector.

We are writing to provide our views regarding the proposed merger of CVS Health Corporation (CVS), the largest retail pharmacy chain and specialty pharmacy in the U.S. and one of the two largest pharmacy benefit managers (PBM), and Aetna, Inc. (Aetna), the third largest U.S. health insurer. The AMA has studied this merger, an analysis that started almost as soon as the merger was officially announced. The AMA has sought the views of prominent health economists, health policy and antitrust experts—some of whom testified in a California Department of Insurance hearing on this merger. After very carefully considering this merger over the past months, the AMA has come to the conclusion that this merger would likely substantially lessen competition in many health care markets, to the detriment of patients. Accordingly, based on the mutually confirming analyses and conclusions presented by the nationally recognized experts and other experts, as well as extensive research, the AMA is now convinced that the proposed CVS-Aetna merger should be blocked.

INTRODUCTION AND SUMMARY OF CONCLUSIONS

This merger is popularly described as vertical when, in fact, horizontal concerns are also substantial. Aetna and CVS compete in the Stand-Alone Medicare Part D Prescription Drug Plan (PDP) market that covers 25 million people nationally. Whether this merger of rivals in the PDP market runs an appreciable risk of substantially lessening competition is easily determined by a straightforward application of the DOJ and Federal Trade Commission (FTC) 2010 Horizontal Merger Guidelines (Merger Guidelines).[1] University of California, Berkeley, health economics professor Richard Scheffler, PhD, has done that analysis.[2] He finds that under the Merger Guidelines, in all but four of the 34 PDP regional markets, this merger would either be "presumed to be likely to enhance market power" or would "potentially raise significant competitive

---

[1] United States Department of Justice and Federal Trade Commission, 2010 Horizontal Merger Guidelines, §1 (August 19, 2010).
[2] Richard Scheffler, PhD, is the distinguished Professor of Health Economics and Public Policy at the School of Public Health and the Goldman School of Public Policy at University of California, Berkeley. He holds the Chair in Health Care Markets and Consumer Welfare endowed by the Office of the Attorney General for the State of California and is the founding director of the Nicholas C. Petris Center on Healthcare Markets and Consumer Welfare.

The Honorable Makan Delrahim
August 7, 2018
Page 2

concerns and often warrant scrutiny." Professor Scheffler concludes that this merger would raise PDP premiums in markets across the country, including California.[3]

In the PBM market also, the merger is fundamentally horizontal. Aetna has a PBM with an ability to integrate medical care with clinical and pharmacy programs and actionable data. While the firm outsources part of its PBM needs to CVS, it retains PBM services that constitute a significant share of the PBM marketplace. Consequently, as a horizontal merger of PBM market participants, the merger again runs afoul of the Merger Guidelines.

The market share and concentration data do not overstate the merger's competitive significance in the PBM market. Aetna has the capacity to be a disruptive competitor in the PBM market and perhaps could compete on quality (e.g., transparency and customer service) in an environment that is currently plagued by the black-box nature of PBM activities. Moreover, the lost competition from this merger is likely to be permanent because barriers to entry in the PBM market prevent new entry, which might restore competitive pricing.

The merger's elimination of Aetna as a potential disruptive competitor and the formation of a vertically integrated PBM tight oligopoly of CVS-Aetna, Express Scripts/CIGNA and United Health/OptumRx further create an appreciable danger of parallel accommodating conduct that is likely to include *not* strengthening the position of downstream insurance market competitors and thus not aggressively bidding for those insurer rivals' contracts. As a result, those rivals would face higher prices for PBM services.

The CVS acquisition of Aetna is also "vertical" because Aetna is a buyer of inputs (such as pharmacy and certain PBM services) that CVS sells. By acquiring Aetna, the country's third largest insurer, CVS would significantly reduce the size of the health insurer market available for competing PBMs and pharmacies (including entrants such as Amazon) to serve. This customer foreclosure would be even more severe in the PBM market, if as a result of this merger, all of the Big Five health insurers (Aetna, CIGNA, Anthem, UnitedHealthcare, and Humana) were vertically integrated with PBMs or in the process of becoming so.[4]

Turning to the health insurer side of the market, there is also an appreciable risk that the created vertical firm, together with the other Big Five health insurers that are integrated with the largest sources of PBM services offered in the highly concentrated PBM market,[5] would raise the costs of insurer rivals. This predictably would occur by the merged firm advantaging its Aetna business by reducing or eliminating the availability of PBM or retail and specialty pharmacy services, or by raising the price of these services to competing health insurers. Any such "input foreclosure"—meaning a refusal to deal with competing health insurers on terms as favorable as those offered a merged Aetna—would substantially harm competition in the highly concentrated health insurance market already dominated by a few firms, including Aetna.

The above anticompetitive developments will have the additional effect of raising barriers to entry into both the PBM and the health insurance markets. Post CVS-Aetna and CIGNA-Express Scripts mergers, the vertical integration between the PBM market and the market for health insurance would become so extensive that entrants into either market would have to enter the other market simultaneously. Given the high barriers to entry into both health insurance and PBM markets, such two-level entry would be a significant deterrent to new entry. The result would likely adversely affect the performance of PBM and health insurance markets

---

[3] Richard Scheffler, PhD, "The Impact of CVS's Acquisition of Aetna on Medicare Part D Stand-Alone Prescription Drug Plan (PDP) Market Concentration" Exhibit B (Scheffler Report).
[4] Anthem is also in the process of developing its own PBM under a contract with CVS.
[5] CIGNA announced its agreement to acquire Express Scripts on March 8, 2018.

The Honorable Makan Delrahim
August 7, 2018
Page 3

that are concentrated, not performing competitively, and in need of policies that *decrease* market concentration.

Finally, there are customer foreclosure effects in the specialty pharmacy market where severely ill Aetna patients are likely to be steered to CVS's specialty pharmacy rather than to pharmacies located in hospitals or physician practices staffed by the patients' treating specialist whose clinical supervision and judgments are needed.

Unless blocked, this merger would likely injure consumers by raising prices, lowering quality, reducing choice and stifling innovation in five poorly performing markets across the country: Medicare Part D Standalone Prescription Drug Plan, PBM services, health insurance, retail pharmacy, and specialty pharmacy.

AETNA-CVS AS A HORIZONTAL MERGER WITH ANTICOMPETITIVE EFFECTS

*The Merger Is Anticompetitive in Markets for the Medicare Part D Prescription Drug Plan*

<u>The Relevant Product Market Is the Medicare Part D Stand-Alone Prescription Drug Plan Market</u>

Medicare beneficiaries can enroll in a Part D private insurance plan that provides prescription drug coverage. For most Medicare beneficiaries not offered a plan by a previous employer, there are two ways to obtain Part D coverage. They can remain in Original Medicare[6] and enroll in a Stand-Alone PDP that only covers prescription drugs and pays monthly premiums for the drug coverage or they can enroll in a Medicare Advantage (MA plan) that offers Medicare prescription drug coverage (MA-PD). In MA plans, Medicare pays most or all of the premiums to a private insurer. Most MA plans are managed care plans; in return for reduced choice of providers and utilization review, the Medicare beneficiary obtains more complete coverage, typically including pharmacy coverage.[7]

At a June 19, 2018, hearing before the California Department of Insurance (DOI) and Insurance Commissioner David Jones (June 19 hearing), Professor Scheffler explained how this merger will injure consumers in the PDP market. Aetna and CVS responded that PDP is not a relevant product market but is instead part of a larger market that includes MA-PD because, the merging parties apparently allege, consumers will readily turn to MA in the event of a small PDP price increase. This is highly unlikely: as consumers are not likely to switch between MA-PD plans and Original Medicare with PDP in response to small price increases. Although the focus was on health (i.e., medical) insurance markets, *United States v Aetna*, 240 F. Supp.3d 1 (D.D.C 2017), is illustrative and highly suggestive. There the *Aetna* court observed that under Supreme Court precedent,[8] markets "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn."[9] The *Aetna* court found little consumer switching between MA and Original Medicare in response to price increases.[10] Instead, senior consumers have distinct and substantial preferences shaped by their comfort with managed care plans and desire to receive all of their benefits from one source (i.e., MA) weighed against their ability to shop and

---

[6] By statute, Congress has provided that seniors can obtain Medicare benefits either "through the original Medicare fee-for-service program," or "through enrollment in a [Medicare Advantage] plan." 42 U.S.C. § 1395w–21(a)(1).
[7] Starc, Amanda, "Comments on Selected Issues re: The Proposed Mergers of Aetna and CVS", Exhibit C (Starc Report) at 6.
[8] *Times Picayne Publishing Company v. United States*, 345 U.S. 594, 612 (1953).
[9] *United States v Aetna*, 240 F. Supp.3d 1, 20 (D.D.C 2017).
[10] Id. at 42.

The Honorable Makan Delrahim
August 7, 2018
Page 4

choose among providers, as is provided by Original Medicare. Consistent with this determination in *United States v. Aetna*, the evidence to date from Part D suggests that most beneficiaries, once enrolled, tend to stick with the plans they have chosen, even when they are faced *with relatively large* premium increases.[11]

<u>The Relevant Geographic Markets</u>

Part D plan sponsors compete on premiums to attract enrollees.[12] This bidding process determines the maximum premium amount Medicare will pay on behalf of low income subsidy (LIS) enrollees. The amount is calculated separately for 34 Part D geographic regions. Twenty-five of the 34 nationwide Part D geographic regions are single state. The remaining nine regions are comprised of multiple states. The importance of the 34 Part D regions in the determination of the maximum premium amount Medicare will pay on behalf of LIS enrollees, plus the fact that plan sponsors must offer a plan in at least one entire region (and cannot pick and choose which geographies within a region they offer plans) makes Part D regions the relevant geographic market.[13]

<u>The Relationship between Market Concentration and Consumer Injury in PDP Markets</u>

Northwestern University professor Amanda Starc, PhD, whose research focuses on health economics and health insurance, particularly on issues involving pharmaceutical markets and regulation, points to a number of studies showing insurer pricing power in the PDP context.[14] Insurer market power in PDP enables an insurer to charge premiums above competitive levels and/or to degrade insurance quality.[15] More generally, the weight of the research on insurance markets indicates that more competing firms or less concentrated local markets lead to lower premiums.[16]

As will be shown below, this merger will vastly increase the concentration in PDP markets. These markets are already lacking in competition and are poorly performing. Nationally, monthly PDP consumer premiums have increased by 58% since the start of the Part D program in 2006. During the same period, the consumer price index increased by only 24%.[17] According to Professor Starc, this merger is likely to lead to further consumer harm.[18]

<u>The Likely Anticompetitive Effect of the Horizontal Merger in PDP Markets</u>

There are at least two ways of measuring market concentration and the degree of danger to competition that a horizontal merger poses. One test, adopted by the 2015 National Association of Insurance Commissioners (NAIC) in its "Model Insurance Holding Company System Regulatory Act," looks to the four firm concentration ratio (NAIC CR4). This concentration ratio is calculated by summing the market shares of the four largest insurers in the market.

---

[11] Kaiser Family Foundation, "To Switch or Not to Switch: Are Medicare Beneficiaries Switching Drug Plans To Save Money?" (October 10, 2013), available at: https://urldefense.proofpoint.com/v2/url?u=https-3A__www.kff.org_medicare_issue-2Dbrief_to-2Dswitch-2Dor-2Dnot-2Dto-2Dswitch-2Dare-2Dmedicare-2Dbeneficiaries-2Dswitching-2Ddrug-2Dplans-2Dto-2Dsave-2Dmoney_&d=DwIFAg&c=iqeSLYkBTKTEV8nJYtdW_A&r=YXZfhuF5LazfglWur9aEAPmfrPHSGcBoFhGKGQuxCJY&m=mOKiygMKlsziuEiutaB3n4vnDLgvm4sxSeJJYAItUhY&s=CINaEiUZNCFYU5QGaEf6lKViBTaFi8nQ2y5bEJIMsEc&e.
[12] Scheffler Report at 2.
[13] Scheffler Report at 4.
[14] Starc Report at 7-8.
[15] Id.
[16] Starc Report at 7.
[17] Scheffler Report at 2.
[18] Starc Report at 3-5 and 15-16.

The Honorable Makan Delrahim
August 7, 2018
Page 5


Under the NAIC CR4 test, a highly concentrated market is one in which the sum of the market shares of the four largest insurers—the four-firm concentration ratio—is 75% or more of the market.[19] In such a highly concentrated health insurance market, there is a prima facie violation of the NAIC CR4 test (its Competitive Standard) when a firm with a 10% market share merges with a firm with a 2% or more market share. In the instant case, a prima facie violation of the Competitive Standard is easily established: CVS's market share is 25.1% and Aetna's market share is 8.6%.

A different market concentration test is adopted by the FTC and DOJ in their Merger Guidelines. The Merger Guidelines use the Herfindahl-Hirschman Index (HHI) to measure market concentration, increases in concentration caused by the merger and the competitive significance of these resulting measurements.[20]

Applying this test to the merger easily reveals its anticompetitive effects. Professor Scheffler finds that 30 PDP regions would experience an HHI increase of over 200 points as a result CVS's acquisition of Aetna.[21] Of these 30 regions, 10 would have a post-merger HHI of greater than 2500. Mergers that increase the HHI by over 200 points and result in a post-merger HHI of over 2500 are "presumed to be likely to enhance market power," according to the Merger Guidelines. The post-merger HHIs of the other 20 regions that would experience increases of 200 HHI would all be in the 1500 to 2500 range, and thus they are deemed to "potentially raise significant competitive concerns and often warrant scrutiny."

Professor Scheffler unequivocally concludes that the merger would raise PDP premiums in California and in other markets across the country:

> I have reviewed a large number of studies that provide evidence that increases in market power raise Medicare Part D premiums [citations omitted]. Based on these studies and my own analysis, the proposed merger of CVS and Aetna will have important and significant impacts on the concentration of the Medicare Part D stand-alone prescription drug plan (PDP) market. In 10 of the 34 PDP regional markets, the merger should be "presumed to be likely to enhance market power" according to the Guidelines. In an additional 20 of the 34 PDP regional markets, the merger will "potentially raise significant competitive concerns and often warranty scrutiny" according to the Guidelines. This latter competitive concern was found for California and it is my opinion that this merger would raise PDP premiums in markets across the country, including California.[22]

---

[19] Scheffler Report at 7 and Table 3.

[20] The HHI is the sum of the squares of the market shares of every firm in the relevant market. The Merger Guidelines divide the spectrum of market concentration into a continuum that ranges from unconcentrated (HHI less than 1500), to moderately concentrated (HHI between 1500 and 500) and highly concentrated (HHI more than 2500). Markets with HHIs less than 1500 are characterized as unconcentrated. Mergers resulting in post-acquisition HHIs of between 1500 and 2500 and experience a change in HHI of more than 100 are deemed to potentially raise significant competitive concerns and often warrant scrutiny. A merger that increases an HHI by over 200 points and results in a post-merger HHI of over 2500 are presumed likely to enhance market power.

[21] Scheffler Report at 8.

[22] Scheffler Report at 10.

The Honorable Makan Delrahim
August 7, 2018
Page 6

*The Merger May Substantially Lessen Competition in the Market for PBM Services*

<u>The PBM Market Is Highly Concentrated and Poorly Performing, Reflecting a Lack of Competition</u>

PBMs are agents of health insurers and employers. They provide two key services to them.[23] First, they negotiate rebates with drug manufacturers in exchange for preferred formulary placement (lower co-pays or coinsurance) for the manufacturer's drugs as compared to drugs from competing manufacturers.[24] Second, they negotiate contracts with pharmacies and thus decide whether a pharmacy will be in the network and the reimbursement the pharmacy will receive for dispensing drugs to the insured consumer.[25]

The national market for PBM services is highly concentrated. CVS, Express Scripts and UnitedHealth Group's OptumRx, which collectively dominate the PBM market (the Dominant Three), account for at least 70% of the market.[26] There is research and anecdotal evidence that the PBM market is not competitive.[27] A February 2018 report from the President's Council of Economic Advisers (CEA Report) states that the existing market structure allows PBMs "to exercise undue market power."[28, 29] Both policymakers and economists have raised serious concerns about the lack of competition in the PBM market and its implications for consumers.[30] Some of these concerns were recently expressed by U.S. Food and Drug Administration (FDA) Commissioner Scott Gottlieb, MD:

> The top three PBMs control more than two thirds of the market: the top three wholesalers
> more than 80%; and the top five pharmacies more than 50%. Market concentration may
> prevent optimal competition. And so, the saving may not always be passed along to
> employers or consumers.
>
> Too often, we see situations where consolidated firms-the PBMs, the distributors, and the
> drugstores-team up with payors. They use their individual market power to effectively split

---

[23] Neeraj Sood, PhD, "Potential Effects of the Proposed CVS and Aetna Merger on Competition and Consumer Welfare", (May 23, 2018), Exhibit D (Sood Report).

[24] Id.

[25] Id.

[26] CVS and Aetna have the first and seventh largest PBM market shares respectively. *See*, "PBM Market Share, by Totally Equivalent Prescription Claims Managed, 2017", Drug Channels Institute, available at https://www.google.com/search?q=pbm+market+shares&tbm=isch&tbo=u&source=univ&sa=X&ved=0ahUKEwj-yZu2-. See, http://www.drugchannels.net/2017/12/the-cvs-aetna-deal-five-industry-and.html, accessed May 22, 2018. See also https://www.google.com/search?biw=1536&bih=726&tbm=isch&sa=1&ei=4AYXW8GhB8b-jwSAraGYDA&q=pbm+market+shares+2018&oq=pbm+market+shares+2018&gs_l=img.3...6596.8649.0.9312.5.5.0.0.0.0.104.32 1.4j1.5.0....0...1c.1.64.img..0.1.103...0i30k1.0._e9ubyaYAS8#imgrc=xO

[27] See e.g. Garthwaite, Craig and Fiona Scott Morton. "Perverse market incentives encourage high prescription drug Prices." Pro-Market Blog., November 1, 2017.

[28] Council of Economic Advisers, Reforming Bio Pharmaceutical Pricing at Home and Abroad (February, 2018) at 10. *See also*, Sood, N., Shih,T., Van Nuys, K., and Goldman, D. 2017. "The Flow of Money through the Pharmaceutical Distribution System." Leonard Schaeffer Center for Health Policy and Economics, University of Southern California.

[29] Starc Report at 9 ("The high level of concentration in the PBM market is likely to persist due, in part, to barriers to entry in the industry. The scale required to negotiate favorable discounts from manufacturers make it difficult for fringe players to compete"). *See also,* American Antitrust Institute correspondence to the Hon. Makan Delrahim, Assistant Attorney General (March 26, 2018) at 5.

[30] See e.g. Brill, Julie. "Dissenting Statement of Commissioner Julie Brill concerning the proposed acquisition of Medco Health Solutions Inc. by Express Scripts Inc." FTC file No. 111-0210, April 2, 2012; Garthwaite, Craig and Fiona Scott Morton. "Perverse market incentives encourage high prescription drug prices." Pro-Market Blog. November 1, 2017.

The Honorable Makan Delrahim
August 7, 2018
Page 7

some of the monopoly rents with large manufacturers and other intermediaries rather than passing on the savings garnered from competition to patients and employers.[31]

The CEA Report observes that drug pricing suffers both from high market concentration in the pharmaceutical distribution system and from a lack of transparency characterized by price obfuscation.[32]

PBM customers have scant information about the rebates supposedly negotiated on their behalf because contracts between PBMs and drug manufacturers are claimed as trade secrets.[33] Not even large payers like Blue Cross or Walmart know the net prices of the drugs they are buying.[34] One expert has concluded that most of the increase in drug pricing can be attributed to rebates pocketed by PBMs.[35]

As recommended by the CEA Report, "policies to decrease concentration in the PBM market…can increase competition and further reduce the price of drugs paid by consumers."[36] Allowing a CVS-Aetna merger would be at war with those policies.

Aetna Has a Significant Market Share as a Supplier of PBM Services[37]

Aetna serves as a PBM for Aetna pharmacy customers.[38] University of Southern California professor Neeraj Sood, PhD, an economist who is an expert on pharmaceutical markets, reported that based on Aetna's own financial statements, the company "performs its core PBM functions."[39] Notably, CVS-Aetna in their reply to the expert reports submitted in the June 19 hearing chose not to deny Aetna's role as a PBM.[40]

While CVS does presently perform certain PBM functions for Aetna under a 2010 agreement that expires in 2022, Aetna has said, "we retain our PBM and our ability to integrate medical care with clinical and

---

[31] Scott Gottlieb, MD, Commissioner of Food and Drugs, "Capturing the Benefits of Competition for Patients," speech before America's Health Insurance Plans National Health Policy Conference (March 7, 2018).

[32] CEA Report at 10.

[33] Statement of Prof. Thomas L. Greaney, University of California Hastings College of Law, "Investigatory Hearing on Merger of Aetna Inc. into CVS Health Corporation, State California Department of Insurance (June 19, 2018) Exhibit I (Greaney Statement).

[34] Robin Feldman, "Perverse Incentives: Why Everyone Prefers High Drug Prices-Except For Those Who Pay the Bills," forthcoming Harv. J. on Legis., available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3162432) (PBM payment structure "minimizes the competitive pressure to reduce prices" and creates incentives "operating to drive prices higher"). See also, Fiona Scott Morton & Lysle T. Boller, "Enabling Competition in the Pharmaceutical Market," Hutchins Ctr. on Fiscal and Monetary Pol'y at Brookings (2017).

[35] "Robert Goldberg, "Drug Costs Driven by Rebates," Center for Medicine in the Public Interest, http://bionj.org/wp-content/uploads/2015/11/drug-costs-driven-by-rebates.pdf.

[36] CEA Report at 10.

[37] While Aetna self-supplies substantial PBM services, it also acquires from CVS/Caremark certain other PBM functions such as purchasing, inventory management, and prescription fulfillment of Aetna's mail-order and specialty pharmacies. These purchases are so substantial that Aetna is CVS/Caremark's largest customer. See https://www.drugchannels.net/2017/12/the-cvs-aetna-deal-five-industry-and.html. Thus there are substantial vertical ramifications of this merger, in addition to the horizontal ones.

[38] See Aetna 2017 10K report at page 7, available online at http://investor.aetna.com/phoenix.zhtml?c=110617&p=irol-reportsAnnual,

[39] Neeraj Sood, PhD, is Professor of Health Policy and Vice Dean for Research at USC's Sol Price School of Public Policy. He is also a faculty member and past Director of Research of the USC Leonard Schaeffer Center for Health Policy and Economics and a Research Associate at the National Bureau of Economic Research. He has published more than 100 papers and reports on health policy and economics. His research focuses on health insurance and pharmaceutical markets and he is an associate editor for leading journals in his field.

[40] See, 2018-07-03 CVS-Aetna Supplemental Submission to CDI (CVS-Aetna Supplemental Submission) Exhibit F.

The Honorable Makan Delrahim
August 7, 2018
Page 8

pharmacy programs and actionable data."[41] Thus, two years into the CVS agreement, then FTC Commissioner Julie Brill found that Aetna was the PBM Dominant Three's "nearest competitor."[42]

According to Adam Fein's Drug Channel Institutes report, "Aetna controls medical and pharmacy policy, formulary design, pharmacy/medical benefit integration, rebate contracting and many other core PBM functions."[43] Drug Channels also reports Aetna's share of the PBM market as 4%.[44]

<u>Self-Supply Is in the Relevant Market</u>

It is unlikely that CVS-Aetna will contest that Aetna's PBM is part of the relevant PBM market for evaluating this merger. Notably, the merging entities themselves list the Kaiser Permanente PBM as part of the competitive landscape for PBM services when Kaiser's PBM only operates inside its integrated health care system and thus, like Aetna, self- supplies PBM services.[45] Nevertheless, we explain below why Aetna's internally-supplied PBM services must be deemed to be in the relevant market for this merger and be included when calculating PBM market shares.

Courts have concluded that, when defining the relevant product market for antitrust purposes, the market must include services that firms provide internally for themselves and similar services that the firm could purchase from an external supplier. For example, in *United States v. ALCOA*, 148 F.2d 416 (2d Cir. 1945), the court considered whether or not iron ingots that ALCOA self-produced were to be included in the ingot market.[46] Although the court recognized that ingots that ALCOA self-fabricated never reached the market as ingot, ALCOA's self-supplied ingots nevertheless "had a direct effect upon the ingot market." Accordingly, the court concluded that computing ALCOA's control over the ingot market should include ingots that ALCOA self-fabricated.[47]

Subsequent decisions have followed *ALCOA*. (See e.g., *United States v. Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001), ("As a matter of law, 'courts have generally recognized that when a customer can replace the services of [an external product] with an internally-created system, this 'captive output' (i.e., the self-production of all or part of the relevant product) should be included in the same market.'") *quoting Federal Trade Commission v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 48 (D.D.C. 1998); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 278 (5th Cir. 1978).

Antitrust scholars likewise recognize the *ALCOA* court's principle. In concluding that self-supplied or internal computer "hotsites" were in the same product as external alternatives, the *Sungard Data Systems* court quoted Areeda in the context of iron ore:

---

[41] https://news.aetna.com/news-releases/aetna-awards-long-term-contract-to-cvs-caremark-to-provide-pbm-services/

[42] Dissenting statement of Commissioner Julie Brill concerning the proposed acquisition of Medco Health Solutions by Express Scripts (April 2, 2012), https://www.ftc.gov/sites/default/files/documents/public_statements/dissenting-statement-commissioner-julie-brill/120402medcobrillstatement.pdf.

[43] See Drug Channels, December 5, 2017 available at https://www.drugchannels.net/2017/12/the-cvs-aetna-deal-five-industry-and.html.

[44] See "PBM Market Share, by Totally Equivalent Prescription Claims Managed, 2017," Drug Channels Institute, available at https://www.google.com/search?q=pbm+market+shares&tbm=isch&tbo=u&source=univ&sa=X&ved=0ahUKEwj-yZu2-

[45] See "CVS-Aetna Supplemental Submission", Exhibit D, at page 3.

[46] *United States v. ALCOA*, 148 F.2d 416 (2d Cir. 1945).

[47] Id.

The Honorable Makan Delrahim
August 7, 2018
Page 9

> If iron ore is the relevant market and if shares are best measured there by sales, then internally used ore—so-called captive output—is part of the ore market even though it is not sold as such.
>
> In measuring the market power of a defendant selling iron ore, the ore used internally by other firms constrains the defendant's ability to profit by raising ore prices to monopoly levels. The higher ore price may induce an integrated firm to expand its ore production—to supply others in direct competition with the alleged monopolist or to expand its own steel production and thereby reduce the demand of other steel makers for ore, or both. Hence, captive output constrains the defendant regardless of whether integrated firms sell their ore to other steel makers previously purchasing from the defendant. In sum, the integrated firm's ore output belongs in the market.[48]

Current PBM market developments involving national health insurers and PBMs show conclusively that PBM services that health insurers self-supply and external PBM services that health insurers purchase from a PBM are part of the same product market. PBM services for health insurers have readily moved from external to self-supply and vice versa. In recent years, nearly all of the large PBMs either have been acquired by national insurers, or national insurers have internalized PBM services. For example, through OptumRX2, United Healthcare self-supplies PBM services. United Healthcare had previously used Medco (which merged with Express Scripts) to provide some of its PBM services. Humana self-supplies PBM services through Humana Pharmacy Solutions. And starting in 2020, Anthem will begin bringing its PBM services in-house with the help of CVS. Previously, Anthem acquired PBM services externally through Express Scripts, which purchased Anthem's in-house PBM services in 2009. Also, notwithstanding the proposed CIGNA-Express Scripts merger, CIGNA already self-supplies PBM services via CIGNA Pharmacy Management, and CIGNA Pharmacy Management also serves numerous Blues plans, including Anthem. This fluctuation between national health insurers self-supplying PBM services and purchasing PBM services from external vendors provides compelling evidence that self-supplied and externally purchased PBM services are included in the same product market under the above-referenced case law and antitrust expert commentary.

Finally, the fact that Aetna may not make its internal PBM services available to other health insurers or other external third parties has no bearing on whether or not those self-supplied PBM services are included in the PBM market. The question is not whether Aetna makes its PBM services available to others, but whether it has the capacity to switch to self-supply. *See Sungard Data Systems* at 187 ("what is significant is not whether the companies that currently use internal solutions have the capacity to enter the market as vendors for others, but whether the customers that currently use shared hotsites would switch to an internal hotsite in response to a small but significant and non-transitory increase in price (SSNIP).") And Aetna, as noted above, already self-supplies PBM services.

---

[48] IIA Areeda et al., Antitrust Law P 535e (1995).

The Honorable Makan Delrahim
August 7, 2018
Page 10


<u>Applications of the Four Firm Concentration Ratio and Herfindahl-Hirschman Index Merger Tests Show the High Degree of Competitive Danger Posed by the Merger</u>

Under the NAIC CR4 horizontal merger test discussed above,[49] the PBM market is highly concentrated–the combined market share of the four largest firms is 75% or higher.[50] And since the merger is of firms with greater than 10% and 2% market shares,[51] the merger is presumptively illegal under the NAIC CR4.

AMA has also applied the HHI test used by the DOJ and FTC. Utilizing the 2017 data on PBM market share by total equivalent prescription claims managed published by the Drugs Channel Institute, AMA has calculated the PBM market HHI as ranging from roughly 1823 points (most conservative) to roughly 1830 points. Assuming CVS and Aetna's shares are exactly 25% and 4% respectively, we estimate that the merger would cause the HHI to increase by 200 points. Therefore, without even considering the obvious competitive problems with this merger discussed below, the proposed merger raises significant competitive concerns under the Merger Guidelines.[52]

<u>The High Barriers to Entry</u>

The lost competition from this merger is likely to be permanent because barriers to entry prevent new entrants from restoring competitive pricing. One barrier is the scale required to negotiate favorable discounts from pharmaceutical manufacturers. PBM entrants need to attract customers with competitive discounts from pharmaceutical firms. However, the magnitude of discounts that a PBM can negotiate with these firms depends on the number of covered lives represented by the PBM, with the size of the discount rising with the size of the PBM. Hence, the three largest incumbent PBMs comprising 70% of the market have a durable price advantage.[53] In addition, the PBM needs to form a national pharmacy network with the ability to contract and process claims from pharmacies within the network. According to Professor Sood, forming such a network "is no small feat for a new entrant."[54]

CVS-Aetna have argued against health economist expert testimony introduced in the June 19 hearing on the high barriers to entry and lack of competition in the PBM market. Quoting from an April 2, 2012, FTC decision, they contend that vigorous competitors "are winning business from traditional market leaders."[55] However, the actual data on PBM market dynamics after 2012 paints a very different picture.[56] According to Professor Sood, data show that not only is the national market for PBMs highly concentrated, the degree of concentration has only increased over time. In 2013, the top three PBMs accounted for 67% of covered lives and in 2017 the market has become more concentrated with the top three PBMs accounting for 73% of covered lives.[57] CVS/Caremark has been a top three PBM since 2013, if not longer, and its market share of covered lives has increased from 22% in 2013 to 26% in 2017. Professor Sood concludes that, "a market with such durable market shares for the top three firms cannot be considered competitive."[58]

---

[49] See discussion at page 3 supra.
[50] See footnote 28 for Drug Channels data used in calculating the CR4.
[51] Actually 25% and 4%.
[52] See discussion of HHI test at page 4 supra.
[53] Starc Report at 9; Sood, Neeraj, Ph.D., Response to "CVS-Aetna Supplemental Submission", Exhibit H (Sood Response) at 2.
[54] Sood Response at 2.
[55] See CVS-Aetna Supplemental Submission.
[56] Sood Response at 12.
[57] Id.
[58] Sood Response at 2.

The Honorable Makan Delrahim
August 7, 2018
Page 11


<u>The Loss of Potential Disruptive Competition</u>

The market share and concentration data do not overstate the proposed merger's future competitive significance in the PBM market. The PBM market would lose Aetna, a national company with an established brand, significant customer base (Aetna health insurance), expertise, capital, and years of experience as a major player in the PBM market. Post-merger (and assuming a CIGNA-Express Scripts merger), there would be no PBMs that could defeat the coordinated conduct of the three largest PBMs (i.e., CVS/Caremark, Express Scripts, and OptumRX) that today comprise 71% of the PBM market and that post-merger would comprise 75%.

And even if the Aetna PBM arm lacked the bargaining power to drive deep drug discounts, it would likely be forced to compete on non-price dimensions that are critically important to consumers. For example, it could compete on quality (transparency and customer service) in an environment that is currently plagued by the black-box nature of PBM activities, as evidenced by the numerous state bills on PBM transparency and at least one ongoing lawsuit alleging PBM overcharging. Without new entry and competition, PBMs can continue to keep secret the size of manufacturer rebates and the percentage of the rebate passed on to health plans and employers.[59]

<u>Coordinated Effects for PBM Services Are Likely</u>

The merger's elimination of Aetna as a potential disruptive competitor and the formation of a behemoth, vertically integrated PBM tight oligopoly will likely, as a practical matter, enable or encourage post-merger coordinated interaction. The Merger Guidelines describe different types of coordinated anticompetitive effects that may result from the elimination of competition. They include, for example, parallel accommodating conduct not pursuant to a prior understanding but instead arising out of aligned incentives and not otherwise condemned by the antitrust laws. One area of aligned Dominant Three interests is associated with *not* strengthening the position of downstream insurance market competitors and therefore not aggressively bidding for their contracts. Both Professors Sood and Starc have concluded that a merged CVS-Aetna is unlikely to compete aggressively for PBM contracts serving Aetna competitors.[60] Professor Sood, a national expert on pharmaceutical and health insurance markets, has concluded that avoidance of such aggressive bids is predictable given data on profit margins in the health insurance and PBM markets.

This data shows that one health insurance customer is many times more profitable than one PBM customer.[61] Moreover, in a number of Metropolitan Statistical Areas (MSAs), the Aetna market shares, for example, dwarf the size of its competitors. Behavior that protects those large shares at the possible expense of lost PBM business is predictable.[62]

CVS-Aetna have responded to this prediction of not bidding aggressively for the business of Aetna insurer rivals by claiming that the PBM arm of the combined company would not want to risk sacrificing a large portion of its business to competitors. However, those PBM "competitors" chiefly would consist of CIGNA-Express Scripts and United Healthcare-OptumRx, the two other behemoths in the tight oligopoly facing the same incentives of not bidding aggressively for contracts that would strengthen their health insurer rivals. Under these circumstances, tacit coordinated behavior of not competing aggressively for PBM customers

---

[59] CEA Report at 10.
[60] See Starc Report at 10-11; Sood Report at 9-10 and Sood Response at 4-5.
[61] Sood at 11-12.
[62] See Sood Report at 7-13, and Sood Response.

The Honorable Makan Delrahim
August 7, 2018
Page 12

competing with the insurance arms of the merged companies is likely. Such coordinated conduct would also be difficult to detect given the fact that PBM "customers may not always be well placed to provide evidence regarding what is in essence opaque activity…."[63]

Although this coordinated behavior has not yet occurred, merger law does not require evidence of actual effects. In fact, in *Hospital Corp. of America v. FTC*, 807 F.2d. 1381 (7th Cir. 1986), the court concluded that "all that is necessary is that the merger create an appreciable danger of collusive practices in the future. A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable is called for."[64] This predictive approach is taken in Clayton Act Section 7 merger cases because the law is prophylactic, intended to arrest coordinated interaction before it may occur in a post-merger setting when the conduct usually cannot be detected and remedied rapidly (if at all) given the proof of agreement requirement contained in Section 1 of the Sherman Act.[65]

The need to block this merger in order to prevent oligopolistic coordinated effects is suggested by healthcare antitrust scholar and University of California Hastings law professor Thomas Greaney, who observes:

> [I]f the CVS-Aetna merger and the Express Scripts-CIGNA merger are allowed to proceed, consumers will be faced with three entities (including UnitedHealthcare/OptumRx) that control an enormous share of the management of health services and pharmaceutical payment. The incentives of the three behemoths will be aligned….[N]one will have incentives to offer favorable competitive terms to small insurers that are rivals of their insurance divisions. Their market power will be protected by the widely recognized and sizable barriers to entry….The emergence of a tight oligopoly of this magnitude may be the most significant risk associated with this merger.[66]

<u>The Horizontal Merger Is Likely to Increase Entry Barriers and Thereby Facilitate or Prolong Noncompetitive Performance</u>

If this merger is approved, the door to new PBM entry will be closed. According to Professor Sood, "standalone PBM entry is unlikely" and entry would instead require that the firm be vertically integrated with a health plan.[67] Given the high barriers to entry characterizing both the markets for PBM services and health insurance, it is highly improbable that a new PBM entrant could successfully enter both the PBM and health insurance markets simultaneously.[68]

*An Additional Horizontal Restraint on Competition Arises Because the Merger Would Allow a Merged CVS-Aetna to Control the PBM Services of Anthem*

CVS recently entered into a contract effective January 1, 2020, with Anthem to supply it with PBM services as Anthem transitions to supplying PBM services in-house. For CVS to operate a PBM with Anthem, the second largest health insurer nationally while owning Aetna, the third largest health insurer, is highly

---

[63] Dissenting statement of Commissioner Julie Brill concerning the proposed acquisition of Medco Health Solutions Inc. by Express Scripts Inc. (April 2, 2012) at 5.

[64] *Hospital Corp. of America v. FTC*, 807 F2d. 1381, 1389 (7th Cir 1986). (Posner, J.)

[65] Herbert Hovenkamp, *Prophylactic Merger Policy*, University of California Hastings Law Journal (forthcoming 2018)

[66] Statement of Prof. Thomas L Greaney, University of California Hastings College of Law, before the Investigatory Hearing on the Merger of Aetna Inc. into CVS health Corporation, State Department of Insurance (June 19, 2018) (Greaney Statement) Exhibit I

[67] Sood Report at 16.

[68] See Starc report at 11, and discussion supra at 8-9, and discussion infra at 13.

The Honorable Makan Delrahim
August 7, 2018
Page 13

problematic.[69] Clearly, a CVS merger with Aetna while managing Anthem's PBM services could facilitate already highly concentrated health insurance and PBM markets, price fixing and the anticompetitive sharing of competitive information—the kinds of horizontal market issues that have appropriately attracted close scrutiny by the FTC and the DOJ and condemnation by the courts.

THE VERTICAL RAMIFICATIONS OF THIS MERGER VIOLATE MERGER LAW

As the third largest health insurer in the country, Aetna is CVS's largest customer and a substantial buyer of inputs (such as pharmacy and certain PBM services) that CVS sells.[70]

*Vertical Mergers and Antitrust Law*

Whether this vertical merger threatens competitive harm requires predictions about the post-merger conduct of the merged firm.[71] The DOJ's 1984 Non-Horizontal Merger Guidelines (1984 Merger Guidelines) provide that a vertical merger may be challenged if the merger may increase barriers to entry, foreclose competitors or facilitate collusion.[72] As discussed below, this merger will likely produce all of these effects in one or more markets. If the resulting combination of CVS-Aetna harms competition in a single market, that would be sufficient under the antitrust laws to enjoin the entire transaction to protect consumers.[73]

One recurring issue in evaluating the vertical restraint ramifications of this merger is what to make of various market foreclosure percentages when there is a dearth of vertical merger case law. Should we condemn this vertical merger where, depending on the market, the foreclosure is in the range of 20 to 30 percent? The temptation is to apply the high foreclosure percentages tests found in vertical restraint exclusive dealing cases. Some of the concerns there are similar to those arising in vertical mergers. Exclusive dealing is an antitrust violation when a significant fraction of buyers or sellers are frozen out of the market by the exclusive deal.[74] Since the Supreme Court's decision in *Jefferson Parish Hospital District No2 v. Hyde*, 466 U.S. 2, 45 (1984), courts have tended to approve exclusive dealing arrangements when the foreclosure is less than 30%.[75] However, there are important differences requiring antitrust condemnation at lower foreclosure percentages in vertical merger cases.[76] The vertical merger is more permanent than exclusive dealing contracts.[77] A merger eliminates the considerable competition that can occur when contracts must be renewed.[78] For example, AMA President, Barbara McAneny, MD,—testifying on behalf of the AMA and herself as a practicing oncologist—observed at the June 19 hearing that when quality of care issues arise between her and a PBM concerning one of her cancer patients, she takes the problem to the insurer. As

---

[69] The market share rankings have been determined by the AMA Health Policy group that produces *Competition in Health Insurance: A Comprehensive Study of US Markets* (2017). *See also, United States v Aetna, supra and United States v. Anthem, supra.*

[70] See https://www.drugchannels.net/2017/12/the-cvs-aetna-deal-five-industry-and.html.

[71] Remarks of D. Bruce Hoffman, Acting Director, Bureau of Competition, Federal Trade Commission before the Credit Suisse Washington Perspectives Conference (January 10, 2018).

[72] 1984 Merger Guidelines at 4.13-3.134.

[73] See *Brown Shoe v. United States*, 370 US at 337 (Section 7 violated "if the anticompetitive effects of the merger are probable in any significant market"); Philip E Arreeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 972a (4th ed. 2014).

[74] *Jefferson Parish Hospital District No2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor concurring opinion).

[75] Herbert Hovenkamp, *Federal Antitrust Policy* §9.4, at p. 346 (1994).

[76] Id.

[77] Id.

[78] Id.

The Honorable Makan Delrahim
August 7, 2018
Page 14

Dr. McAneny explained, at contract renewal time, Aetna is free to weigh her consumer quality demands against financial concerns. However, once Aetna has a permanent ownership interest in CVS, Aetna will have a financial interest in CVS's specialty pharmacy continuing to gain market share and be less responsive to her consumer demands.

Aetna and CVS, of course, do not acknowledge the substantial competitive consequences of moving from exclusive dealing to vertical merger. For example, in defending the transaction at a congressional hearing on this merger, Aetna's counsel suggested that the merger would not diminish competition in the PBM market given the status quo: "We already rely on CVS to perform pharmacy benefit management functions for the bulk of our members."[79] This statement obscures the significant change in the competitive structure of the market that the merger would cause. The fact that CVS now supplies Aetna with a PBM service is the result of ongoing competition that would be lost in the merger. Even long-term service contracts maintain competition in the marketplace. This is called "competition for the contract," that, in the words of acclaimed antitrust jurist Richard Posner, is a "form of competition the antitrust laws protect."[80] Once the parties merge, that competition for the contract is forever lost.

University of Pennsylvania professor Herbert Hovenkamp, who perhaps is the nation's most pre-eminent antitrust scholar, observes that "[w]hen the integration occurs by merger…the downstream business becomes part of the colluding firm itself. As a result, condemnation on market shares of 25% or perhaps even 20% seems appropriate, provided that entry barriers are high and other market factors indicate that collusion or oligopoly is likely."[81]

The CVS-Aetna vertical merger should be condemned under Professor Hovenkamp's criteria. The companies operate in concentrated or highly concentrated markets. As a result of the merger, pharmacies competing with CVS in localized markets will likely be deprived of a significant portion of those markets represented by Aetna's health insurance market shares that are frequently in excess of 20%. For example, in MA, Aetna's market share is greater than 20% in 62 MSAs, greater than 25% in 40 MSAs and greater than 30% in 32 MSAs.[82] Moreover, publicly available data suggest that CVS/Caremark steers patients to CVS pharmacies.[83] Similarly, health insurers competing with Aetna and seeking a competitive supply of PBM services will likely experience "input foreclosure" measured by CVS's market share of PBM services of at least 25% in a highly concentrated market.

*Vertical Merger Causes Anticompetitive Effects in the PBM Market: Increasing Barriers to Entry and Foreclosing Competitors*

The 1984 Merger Guidelines recognize that a vertical merger might increase entry barriers and identify three conditions that are generally necessary for vertical mergers to raise anticompetitive entry barrier problems:

---

[79] Statement of Thomas Sabatino, Aetna Executive Vice President and General Counsel, before the House Judiciary Committee at a hearing entitled "Competition in the Pharmaceutical Supply Chain: The Proposed Merger of CVS Health and Aetna" (February 27, 2018) at page 6.

[80] *Methodist Health Services Corp. v. OSF Healthcare System*, 859 F.3d 408 (2017) (Posner J) ("competition-for-the-contract is a form of competition that antitrust laws protect"). *See also* Harold Demsetz, "Why Regulate Utilities?" 11 J. Law & Econ. 55 (1968).

[81] Id.

[82] Aetna, the third largest health insurer nationally, has slightly lower market shares in commercial health insurance markets. See AMA health insurance market share analysis. Exhibit E.

[83] Drug Channels Report (March 2015) based on CVS 10-K SEC Filing available at: https://www.drugchannels.net/2015/03/cvs-health-newest-data-on-retail-pbm.html.

The Honorable Makan Delrahim
August 7, 2018
Page 15

First, the degree of vertical integration between the two markets (here, the markets for PBM services and health insurance) must be so extensive that entrants to one market (the primary market for PBM services) also would have to enter the other market (the secondary market for health insurance) simultaneously. Second, entry into the secondary level must make entry at the primary level significantly more difficult and less likely to occur. Third, the structure and other characteristics of the primary market must be otherwise so conducive to non-competitive performance that the increased difficulty of entry is likely to affect its performance.[84]

<u>Vertical Integration is Extensive and Two-Level Entry Is Likely to be Required Post-Merger</u>

This merger is likely to have significant adverse entry barrier effects because the merger is part of an existing trend toward vertical integration between the PBM and health insurance markets that has become so extensive that post-merger entrants to the PBM market also would have to enter the health insurance market simultaneously.

Assuming a CIGNA-Express Scripts merger, a much needed new PBM market entrant today finds that Aetna is the sole Big Five insurer that neither has all its long-term PBM supply needs served in-house nor is transitioning to in-house as in the case of Anthem. Given that Aetna is the third-largest insurer in a highly concentrated health insurance market, its merger with CVS would drastically reduce the health insurer customer market available to PBMs as sellers. This "customer foreclosure" would further raise market entry barriers associated with the need to gain the covered lives necessary for negotiating discounts.

Consistent with the extensive PBM and health insurer vertical integration, foreclosure of competitors, and the anticompetitive increase in barriers to entry created by the merger are reports in the Wall Street Journal that CVS is acquiring Aetna to tie-up that business before Amazon can enter the market.[85]

Lacking an outlet for PBM services, any new PBM entrant would need to engage in two stage entry by also entering the highly concentrated health insurance market that has significant entry barriers independent of integration.

<u>The Need for Two-Level Entry Is a Significant Deterrent to New Entry into the PBM Market</u>

As discussed earlier, there are high barriers to entry into the PBM market and a would-be PBM market entrant would face the daunting task of also entering health insurance markets.[86] Health insurance markets are similarly highly concentrated and have high barriers to entry.[87] Barriers to entry include state regulatory requirements; the need for sufficient business to permit the spreading of risk; and contending with established insurance companies that have built long-term relationships with employers and other consumers.[88] Perhaps the greatest obstacle is akin to the one facing PBMs—the so-called "chicken and egg problem." Here, health insurer entrants need to attract customers with competitive premiums that can only be

---

[84] 1984 Merger Guidelines section 4.212.

[85] See e.g. "A Force behind the Aetna Bid: Amazon," the *Wall Street Journal*, (October 27, 2017).

[86] See discussion of barriers to entry at pages 8-9 supra.

[87] See *United States v. Aetna*, 240 F. Supp. 3d 1 (D.D.C. 2017); *United States v. Anthem*, 855 F.3d 345 (D.C. Cir. 2017)

[88] See Robert W. McCann, *Field of Dreams: Dominant Health Plans and the Search for a "Level Playing Field,"* Health Law Handbook (Thomson West 2007); Mark V. Pauly, *Competition in Health Insurance Markets*, 51 Law & Contemp. Probs. 237 (1988); Federal Trade Commission and U.S. Department of Justice, Improving Health Care: A Dose of Competition (July, 2004); *Vertical Restraints and Powerful Health Insurers: Exclusionary Conduct Masquerading as Managed Care?*, 51 Law & Contemp. Probs. 195 (1988).

The Honorable Makan Delrahim
August 7, 2018
Page 16

achieved by obtaining discounts from providers. However, providers usually offer the best discounts to incumbent insurers with a significant business—volume discounting that reflects a reduction in transaction costs and greater budget certainty. Hence, incumbent insurers have a durable cost advantage.[89]

Therefore, the requirement of entry into the health insurance market would make entry into the PBM market "significantly more difficult and less likely to occur."[90]

<u>The PBM Market Is So Conducive to Noncompetitive Performance That the Increased Difficulty of Entry Is Likely to Affect Its Performance</u>

Given that the PBM market is concentrated, not performing competitively, subject to the likely coordinated interaction of three firms controlling over 70% of the PBM market and in need of policies that decrease market concentration, the third enforcement requirement of the 1984 Merger Guidelines—essentially, that the market can benefit from decreasing entry barriers—is met.[91] If the merger were to occur, the Dominant Three firms would have less reason to moderate noncompetitive behavior in order to discourage new entry.

*Facilitating Collusion among Three Largest PBM Suppliers as Additional Ramification of Vertical Merger*

Finally, the broader circumstances associated with the CVS-Aetna merger—the concurrent CIGNA-Express Scripts merger and United Healthcare's operating its own PBM (OptumRX)—raises the potential for horizontal coordination among the Dominant Three, all vertically integrated into health insurance. Facing little threat from Aetna, a disruptive buyer as well as a major self-supplier, competing PBMs would have strong incentives and capacity to coordinate their PBM strategies to disadvantage rival health insurers.[92]

THE VERTICAL MERGER IS ANTICOMPETITIVE IN THE GENERALLY HIGHLY CONCENTRATED MARKETS FOR HEALTH INSURANCE

*Health Insurance Markets Are Highly Concentrated and Have High Barriers to Entry*

It is now well-established that markets for health insurance are highly concentrated, often dominated by one or two insurers. The AMA's 2017 Update to *Competition in Health Insurance: A Comprehensive Study of U.S. Markets,* finds that nearly 70 percent of the combined HMO + PPO + POS + EXCH (commercial) markets are highly concentrated. Moreover, Aetna's market share is either the first or second largest in 57 of the 389 MSAs studied. In a separate analysis of MA insurer markets, the AMA found that 85 percent of MA markets are highly concentrated. Aetna had the first or second largest MA market share in 60 of the 381 MSAs studied. In a total of 94 MSAs, Aetna had the first or second largest share in the commercial market, MA market, or in both of those markets. In addition, health insurance markets have high barriers to entry.[93]

---

[89] Id. at 7.

[90] 1984 Merger Guidelines at Section 4.2.

[91] See supra at 8 showing that the PBM market HHI is above the 1800 threshold found in the 1984 Merger Guidelines and that also provide for antitrust enforcement at a "somewhat lower concentration level", if other factors "indicate that affective collusion is particularly likely." See 1984 Merger Guidelines at section 4.213.

[92] See statement of University of California at Hastings Law Professor and prominent antitrust in healthcare scholar, Thomas Greaney, at page 6. ("The incentives of the three behemoths will be aligned…None will have incentives to offer favorable competitive terms to small health insurers that are rivals of their insurance divisions.")

[93] See barriers to entry discussion supra at 13-14 and more generally, *United States v. Aetna*, 240 F. Supp. 3d 1 (D.D.C. 2017); *United States v. Anthem*, 855 F.3d 345 (D.C. Cir. 2017).

The Honorable Makan Delrahim
August 7, 2018
Page 17

*Vertical Merger Ramifications in the Health Insurance Market*

According to Professor Sood, the merger will further strengthen the already dominant position of Aetna in local health insurance markets "and will exacerbate the lack of competition."[94] This will come from CVS-Aetna's ownership and control of two segments of the pharmaceutical supply chain—PBMs and retail pharmacies.[95]

Foreclosure of Aetna's Health Insurer Competitors Requiring PBM Services and Increasing Barriers to Entry in Health Insurance

PBM services are an important input into the production and selling of health insurance, an area of the economy that requires more, not less, entry and competition.[96]

In the event the CVS-Aetna merger were approved, Aetna rivals that decide to rely on drug rebates from CVS are likely to be hurt by the merger, ultimately to the detriment of competition and consumers in the health insurance market. As explained earlier, the PBM arm of CVS-Aetna would have weaker incentives to control prescription drug costs and overall health care costs for health plans competing with Aetna.[97] Indeed, in Professor Sood's opinion, "the PBM arm of CVS-Aetna has an incentive to disadvantage health plans competing with the insurance arm of CVS-Aetna in passing on rebates from pharmaceutical firms. This will likely result in less competition in the insurance market."[98]

Professor Sood observes that the adverse effects of the incentives for CVS-Aetna to disadvantage competing health plans are exacerbated by the fact that the PBM market is highly concentrated. Health plans competing with CVS-Aetna face PBM "input foreclosure." Most desirable sources of PBM services are firms like CVS and Express Scripts that are large enough to drive the biggest discounts in drug prices. Given the announcement of CIGNA's agreement to acquire Express Scripts, if Aetna were to merge with CVS, all of the large PBMs would either have been acquired by the Big Five insurers or have otherwise become an in-house service of these insurers.[99]

Aetna rivals or new health insurer market entrants could easily fall victim to a strategy known as "raising rivals costs." The PBMs owned by (or that own) a health insurer could refuse to deal with other health insurers except on discriminatory terms that lessen competition in the health insurance market.

Therefore, Professor Starc foresees an increased barrier to entry that may require two-level entry post a CVS-Aetna merger.[100] Given the high barriers to entry in both the PBM and health insurance markets,[101] the need for two-level entry is a significant deterrent to entry into health insurance markets.

---

[94] Sood Report at 8 and Sood Response at 4-6.

[95] Id.

[96] Given the present structure of the health insurance market, health insurers have the ability unilaterally or through coordinated interaction to exercise market power by raising premiums, reducing service or stifling innovation. *See United States v. Aetna*, 240 F. Supp. 3d 1 (D.D.C. 2017); *United States v. Anthem*, 855 F.3d 345 (D.C. Cir. 2017).

[97] See discussion supra at 9-10.

[98] Sood Report at 10.

[99] UnitedHealthcare now operates OptumRX2; Humana has Humana Pharmacy Solutions; Anthem is developing its own PBM service with the help of CVS; and CIGNA operates CIGNA Pharmacy Management, in addition to proposing to acquire Express Scripts. See also Sood Report at 10.

[100] Starc Report at 11.

[101] See discussions at 8-9 and 13-14 supra.

The Honorable Makan Delrahim
August 7, 2018
Page 18


<u>The Need for Two-Level Entry is Likely to Adversely Affect Health Insurance Market Performance</u>

The end result of this input foreclosure for health insurers seeking PBM services will be less competition in an already highly concentrated health insurance market. In the opinion of Professor Sood, the merger will further strengthen the already dominant position of Aetna and will exacerbate the lack of competition in health insurance markets.[102]

<u>Foreclosure of Aetna Health Insurer Competitors Requiring Local Retail Pharmacy Networks</u>

Just as a merged CVS-Aetna is likely to disadvantage and to increase barriers to entry for insurer competitors needing PBM services, the merged firm may also foreclose competing insurers from access to CVS "must have" retail pharmacies, either entirely or by offering terms that are not competitive with those offered Aetna. Professor Sood reasons that CVS-Aetna could leverage its must-have pharmacy network to disadvantage competing plans.[103] Health plans that do not have CVS in their pharmacy network will be less attractive to consumers, especially in markets where CVS has a dominant pharmacy market share. CVS-Aetna could exploit this fact to charge higher prices to health plans competing with CVS-Aetna. This effect, says Professor Starc, may be especially important in the market for generic drugs, which are generally competitive at the wholesale, but not the retail, level and represent a large fraction of total bills.[104] In recent years, prices for some generic molecules (even particularly old ones whose branded equivalents' patents expired decades ago) have increased substantially. According to Professor Sood, if health plans refused to accept the high prices and do not include CVS-Aetna pharmacies in their network, they risk losing customers. If they accept the high prices, then they face higher health care costs, which might result in higher premiums and lower market share for these health plans. This will result in less competition in the insurance market.[105]

The likelihood of the merged firm's pharmacy customers falling victim to the merged company's favoring the Aetna side of its business is enhanced by "the numbers." Professor Sood has found that "one insurance customer is as valuable as roughly nine pharmacy customers; providing strong incentives for CVS-Aetna to disadvantage competing health plans to gain insurance customers even if it risks losing some pharmacy customers."[106]

<u>Facilitating Collusion among Health Insurers as Additional Ramification of Vertical Merger</u>

If CVS were to merge with Aetna, then health plan entrants and Aetna rivals seeking PBM partners would essentially be forced to share sensitive information with insurer competitors—something they may be loath to do even with the promise of information firewalls.

For example, Aetna could potentially have access to the prescription drug experience of Aetna's competitors, which might help it engage in cream-skimming. Aetna could determine the illness profile of its competitors' covered populations. If Aetna determines that those populations consist of desirable insureds, it can design formulary profiles and other health insurance benefit design features to attract them. But if they have high drug expenditures, Aetna could steer them away.

---

[102] Sood Report at 8.
[103] Sood Report at 11.
[104] Starc Report at 11.
[105] Sood Report at 10 and Starc Report at 11.
[106] Sood Report at 12.

The Honorable Makan Delrahim
August 7, 2018
Page 19


Aetna's potential post-merger access to competing health insurer confidential business information could also create opportunities for monitoring competitors' costs and for health insurer collusion that are additional reasons for opposing the merger.

THE MERGER IS ANTICOMPETITIVE IN LOCAL PHARMACY MARKETS

*Local Pharmacy Markets Appear Highly Concentrated and CVS Likely Has Market Power in Some of Those Local Markets*

Retail Pharmacy

Local pharmacy markets in the U.S. are uncompetitive or highly concentrated.[107] A 2015 Business Insider article entitled, "CVS and Walgreens Are Completely Dominating the US Drugstore Industry," reports that even before CVS acquired 1660 Target Corporation pharmacies, CVS and Walgreens together controlled between 50% and 75% of the retail pharmacy markets in numerous large cities.[108]

CVS essentially acknowledges in its 2015 Securities and Exchange Commission form 10-K filing that retail pharmacy markets are local and that in those localized markets CVS has shares that are consistent with Professor Sood's opinion that CVS is a dominant firm. CVS states, "[w]e currently operate in 98 of the top 100 United States drugstore markets and hold the number one or number two market share in 93 of these markets."[109]

Moreover, CVS's high local market shares understate the likelihood of market power. CVS pharmacy chains may be considered "must have" pharmacies. They are "must have" because health plan sponsors prefer geographically comprehensive networks—pharmacies located in close proximity to their patient population. Reportedly, 76 percent of the population of the U.S. lives within five miles of a CVS pharmacy.

CVS's large retail pharmacy market shares are also durable because of high barriers to entry into the drugstore business.[110] Even the CEO of CVS, Larry Merlo, acknowledged the high barriers to entry in an interview responding to speculation about Amazon entering the pharmacy business. In this interview, Merlo stated, "[t]here are many barriers to entry when you're looking at pharmacy…It's highly regulated, so the barriers to entry are high."[111]

CVS declined the opportunity to directly contest the notion of localized retail pharmacy markets posited by Professor Sood in the June 19 hearing. Instead, CVS simply recited the firm's national and statewide shares as measured by number of stores (that would include pharmacies located in grocery stores) rather than by the more meaningful measure of total prescriptions.[112] CVS also attacked the notion that retail pharmacy is a relevant product market that is separate and distinct from mail-order or online pharmacies. California

---

[107] See expert report of Neeraj Sood, PhD, Professor of Health Policy and Vice Dean for Research at The Sole Price School of Public Policy, University of Southern California ("Pharmacy markets in the U.S. are uncompetitive or highly concentrated").

[108] "CVS and Walgreens Are Completely Dominating the US Drugstore Industry", Business Insider (July 29, 2015), http://www.businessinsider.com/cvs-and-walgreens-us-drugstore-market-share-2015-7.

[109] CVS Health Corporation, "United States Securities and Exchange Commission, Form 10-K Filing" https://www.sec.gov/Archives/edgar/data/64803/000006480316000074/cvs-20151231x10k.htm at page 6.

[110] Sood Response at 3.

[111] August 9, 2017. Forbes interview available at https://www.forbes.com/sites/brucejapsen/2017/08/09/cvs-health-ceo-doubts-amazon-entry-into-pharmacy/#7e1d07df3acb on

[112] See CVS-Aetna Supplemental Submission.

The Honorable Makan Delrahim
August 7, 2018
Page 20

consumers however do not drive to Massachusetts to get their prescription drugs. Nor are mail-order and online pharmacies good substitutes for a local drugstore because of the time it takes to ship prescription drugs to consumers and the lack of ability to consult with a pharmacist in person.[113] This is likely why federal regulations in both Medicare Part D and Affordable Care Act (ACA) markets mandate that health plans provide enrollees with adequate local access to in-network retail pharmacies with respect to their prescription drug benefits.[114]

In sum, retail pharmacy markets are local, perhaps MSAs or smaller localities within MSAs.[115] They are also uncompetitive or highly concentrated, and CVS's shares and status as a "must have pharmacy" likely enables it to exercise market power either unilaterally or through coordinated interaction.

Specialty Pharmacy

CVS is the largest specialty pharmaceutical firm in the U.S.[116] Specialty pharmacy is driving the pharmacy industry's revenue growth[117] and represents a growing proportion of drug costs.[118] According to Pembroke Consulting, "the growth of specialty drugs is reshaping the pharmacy and pharmacy benefit management industries."[119]

Specialty pharmacies tend to focus on providing medications for patients with complex medical conditions.[120] Specialty pharmacy drugs are typically high cost and have special development, handling, administrative and medical monitoring requirements.

Data indicate that specialty pharmacies operate in a concentrated and oligopolistic market.[121] Nearly 60% of all prescription revenues from specialty pharmaceuticals are collected by the three largest firms—owned by CVS Health, Express Scripts and Walgreens Boots Alliance.[122] In 2017, CVS reportedly had a 25% specialty pharmacy market share, measured by specialty pharmaceutical revenues.[123] CVS's specialty pharmacy market share appears to be growing, as described in the CVS Health 2017 Annual Report:

> We remain the largest specialty pharmacy by a considerable margin, resulting in greater scale and stronger purchasing economics … Looking at 2018, we expect to continue outpacing the marketplace by adding another $4 billion in specialty revenue.

*CVS Acknowledges That CVS Pharmacy and CVS Specialty Pharmacy Appear to Possess Market Power*

In its form 10-K filed with the SEC for the fiscal year ended December 31, 2016, CVS informed investors of the antitrust risks intrinsic to its appearance of market power. CVS stated:

---

[113] See Sood Response at page 3.
[114] 45 CFR §156.122 and 45 CFR §423.120.
[115] Sood Response at page 3.
[116] https://www.drugchannels.net/2018/03/the-top-15-specialty-pharmacies-of-2017.html.
[117] Outlook for Specialty Pharmacy Prescription Revenues, Drug Channels (subsidiary of Pembroke Consulting), April 11, 2017, *http://www.drugchannels.net/2017/04/our-exclusive-2021-outlook-for.html.*
[118] Starc Report at 9.
[119] Id.
[120] Id.
[121] Starc Report at 9 (Specialty market "remains extremely concentrated").
[122] Id at 10.
[123] https://www.drugchannels.net/2018/03/the-top-15-specialty-pharmacies-of-2017.html.

The Honorable Makan Delrahim
August 7, 2018
Page 21

> To the extent that we appear to have actual or potential market power in a relevant market or
> CVS pharmacy or CVS specialty pharmacy plays a unique or expanded role in a PBM
> product offering, our business arrangements and uses of confidential information may be
> subject to heightened scrutiny from an anti-competitive perspective and possible challenge
> by state or federal regulators or private parties.[124]

*Merger Ramifications in the Markets for Retail and Specialty Pharmacy*

<u>Foreclosing Competitors in Retail Pharmacy</u>

Professor Sood has opined that "the merger of CVS and Aetna will further strengthen the already dominant position of CVS in the pharmacy market and will exacerbate the lack of competition in pharmacy markets."[125]

In addition to owning pharmacies, CVS through its PBM, also contracts with independent pharmacies to be in its pharmacy network, promising access to plan subscribers in return for the pharmacies discounting their fees for filling prescriptions. Thus, CVS is both a competitor and a critical customer of independent pharmacies.

If CVS were to acquire Aetna and the latter were to require that patients use CVS-owned pharmacies, independent pharmacies may be foreclosed from the market and point-of-sale drug prices may rise. Indeed, there is some evidence that CVS has already used its market power in the PBM market to disadvantage independent pharmacies that compete with CVS-owned pharmacies. A January 23, 2018, *American Prospect* article entitled, "Abusing Drugs: How CVS Uses Its Market Power to Destroy Competing Independent Pharmacies," authored by David Dayen, reports that:

> CVS's existing combination of a pharmacy (which dispenses drugs) and a pharmacy benefits
> manager (which reimburses other pharmacists for dispensing drugs) is a disaster for
> competition and access, particularly in underserved communities. Adding a health insurer
> like Aetna would further concentrate market power and narrow the networks people depend
> upon for medical care.[126]

The *American Prospect* article says that beginning around the time the CVS-Aetna merger was announced in the press, independent pharmacists began to notice significant cuts to reimbursement rates for prescription drugs on plans managed by CVS. The cuts reportedly were to levels below the independent pharmacies costs of acquiring the drugs and were concentrated in Medicaid managed care plans that constitute a disproportionate share of independent pharmacy income. At the same time of the cuts, says the article, CVS's acquisitions department sent letters to the independent pharmacists inquiring about buying their stores.[127]

---

[124] CVS Health 2017 Annual Report at 20.

[125] Sood Report at 13.

[126] David Dayen, "Abusing Drugs: How CVS Uses Its Market Power to Destroy Competing Independent Pharmacies," *American Prospect* (Jan 23,2018) at <u>https://urldefense.proofpoint.com/v2/url?u=http-3A__prospect.org_article_abusing-2Ddrugs&d=DwIFAg&c=iqeSLYkBTKTEV8nJYtdW_A&r=YXZfhuF5LazfglWur9aEAPmfrPHSGcBoFhGKGQuxCJY&m=FDJ9rI1hwFVMepr1zb2N4aRTip5sKlsAHo7J4GPO4zU&s=y9khpj6sXs3L6fNCKrAjuMTWgN80081bnBGd6PvwZrw&e=</u>

[127] Additional reports of anticompetitive conduct can be found in the Sood Report at 13-14 and Sood Response at 4.

The Honorable Makan Delrahim
August 7, 2018
Page 22

The AMA encourages the DOJ to investigate whether CVS has engaged in predatory behavior, as reported in the American Prospect article. If accurately reported, the DOJ should weigh this prior conduct and the large market shares that CVS now possesses in PBM and retail pharmacy markets and consider whether, by locking up all of Aetna's prescription volume, CVS would have a dangerous probability of acquiring and exercising market power in retail pharmacy markets.

Foreclosing Competition in Specialty Pharmacy

The merger has worrisome ramifications in the specialty pharmacy market.[128] Post-merger, Aetna would have a direct and permanent financial interest in incentivizing or forcing Aetna patients wanting insurance coverage, without crushing coinsurance requirements on extraordinarily expensive drugs, to utilize CVS's specialty pharmacy for the dispensing and administration of specialty drugs rather than obtain the drugs in treatment settings such as physician practices, hospitals and health systems.[129] The latter treatment settings dispense and administer drugs where patient compliance with dosing amounts and intervals can be monitored, side effects evaluated and, if necessary, critical drug dosages adjusted. These are clinical services that patients receiving specialty drugs often need to stay alive.

While CVS's specialty pharmacy might for some patients be a lower cost setting for obtaining and/or administering drugs,[130] there can be adverse clinical consequences in addition to financial ones.[131] Professor Starc warns:

> Aetna may attempt to steer at least a portion of their consumers to CVS' specialty pharmacy in ways that may harm competition or overall consumer welfare. Anticompetitive behavior is especially concerning in this setting, as it may have important clinical, in addition to financial, consequences.[132]

Today Aetna is free to weigh the quality demands of patients against financial concerns at, for example, contract renewal time, as compared to a merged Aetna with a permanent ownership interest in CVS's specialty pharmacy.[133] CVS's status as one of the two largest PBMs has allowed it to steer patients and third-party payers to utilize CVS as their specialty pharmacy.

Tying CVS specialty pharmacy to adequate health insurance is among the allegations against CVS in a class action filed in the United States District Court for the Northern District of California.[134] While not couched as an antitrust tying claim, the suit alleges, in part, that many enrollees in health plans where CVS controls and administers the pharmacy benefits are told they are required to obtain their HIV/AIDS medications from CVS's California specialty pharmacy, a wholly-owned subsidiary of CVS. Patients allegedly are "told that they must either pay more out of pocket or pay full price with no insurance benefits whatsoever-thousands of dollars or more each month-to purchase their medications at an in-network community pharmacy where they

---

[128] See Starc Report at 10.
[129] Id.
[130] See Dafny in the NEJM: https://www.nejm.org/doi/full/10.1056/NEJMp1717137?query=TOC
[131] See Complaint in *John Doe One et al v. CVS Health Corporation,* case 2:18-CV-01280-RS WL-J PR (filed February 16, 2018).
[132] Starc Report at page 10.
[133] See discussion of physicians on behalf of patients advocating with health insurers and how that advocacy is adversely affected when the insurer has an ownership interest in furnishing the specialty drugs. Supra, page 6.
[134] *John Doe et al v. CVS Pharmacy, Inc., Caremark LLC et al,* Case No. 3:18 – CV – 1031-EMC ( D. N.D. Cal) (filed June 18, 2018).

The Honorable Makan Delrahim
August 7, 2018
Page 23

can receive counseling from a pharmacist and other services they may need to stay alive."[135] While these claims are yet unproven allegations in litigation,[136] similar allegations of CVS's tying its specialty pharmacy services to its PBM services appear in a second lawsuit, this one pending in the Southern District of Florida.[137] There the plaintiff alleges that CVS forces "patients and third-party payers to utilize CVS as their specialty pharmacy."[138]

The augmentation of market power in the already concentrated and oligopolistic specialty pharmacy market created by the Aetna health insurance acquisition exacerbates these concerns.[139] If past is prologue, a significant fraction of local health insurance markets represented by Aetna's market shares will be foreclosed to specialty pharmacies administering specialty drugs. In addition, a significant fraction of patients will be deprived of the clinical settings they prefer for legitimate quality reasons.

CLAIMED EFFICIENCIES DO NOT JUSTIFY THIS MERGER

CVS-Aetna argue that any anticompetitive effects under Section 7 of the Clayton Act resulting from the proposed merger will be outweighed by efficiencies. However, the U.S. Supreme Court has never approved an efficiencies defense to a section 7 claim.[140] For example, in *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967), the U.S. Supreme Court stated that, "[p]ossible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition."[141]

Although the U.S. Supreme Court has never recognized this efficiency defense, the Sixth, District of Columbia, Eighth and Eleventh U.S. Courts of Appeals "have suggested that proof of post-merger efficiencies could rebut a Clayton Act § 7 prima facie case."[142]

Nevertheless, as the Ninth Circuit recently noted, even in those circuits, no federal appellate court had ever found any such efficiencies sufficient to rebut a prima facie case:

> However, none of the reported appellate decisions have actually held that a § 7 defendant
> has rebutted a prima facie case with an efficiencies defense; thus, even in those circuits that
> recognize it, the parameters of the defense remain imprecise.[143]

---

[135] Id.

[136] The alleged CVS behavior exhibits some of the features of an antitrust tying claim-- two products (or services) "tied" together in the sense that if the patient wants the tying product or service, she will be forced to take the other (or "tied") product that she either does not want or would prefer to purchase from someone else under different terms. *See Jefferson Parish Hospital Dist. No 2 v Hyde*, 466 U.S. 2 (1984). However, for there to be antitrust liability for tying, the forcing must result from the defendant exercising market power, typically shown by a large market share. *Id.* In the absence of a tying violation, the conduct may still be of antitrust concern in the context of a merger case because merger law prophylactically protects the public from future antitrust violations that might be difficult to detect and prove. See Hovenkamp, *Prophylactic Merger Policy,* University of California Hastings Law Journal (forthcoming 2018).

[137] *Sentry Data Systems v. CVS Health et al*, Case 0:18-cv-60257, filed February 5, 2018.

[138] Id.

[139] The potential for abuse is largest in the commercial market. However, Aetna's Medicare Advantage enrollees-for whom Aetna is responsible for drug utilization regardless of the site of administration-could be affected as well.

[140] *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.,* 778 F.3d 775, 789-780 (9th Cir. 2015).

[141] Id. at 789, citing *FTC v. Procter & Gamble,* 386 U.S. 568, 580 (1967). See also 4A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 950f, at 42; id. 970c, at 31.

[142] Id.

[143] Id.

The Honorable Makan Delrahim
August 7, 2018
Page 24

But even in those circuits that entertain the possibility that sufficient evidence of efficiencies might rebut a section 7 prima facie case successfully established by a plaintiff, courts place a significant restriction on the kinds of evidence that a plaintiff can use to support an efficiency rebuttal. Merely "claimed" efficiencies do not suffice—only verifiable efficiencies count.[144] Further,

> Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means. Projections of efficiencies may be viewed with skepticism, particularly when generated outside of the usual business planning process. By contrast, efficiency claims substantiated by analogous past experience are those most likely to be credited.[145]

Under the Merger Guidelines,[146] only efficiencies that are "cognizable" may be considered. Cognizable efficiencies are those that are likely to be accomplished with the proposed merger and unlikely to be achieved in the absence of the merger."[147] To escape federal antitrust merger enforcement, cognizable efficiencies must be of a character and magnitude such that the merger is not likely to be anticompetitive in *any* relevant market.

*Aetna Already Performs Core PBM Functions and Presently Integrates Pharmacy and Medical Data to Lower Costs*

In the June 19 hearing, CVS-Aetna claimed that "a key driver of consumer benefits from the merger would be the ability to combine CVS's pharmacy data and expertise with Aetna's medical data and expertise." However, Professor Sood pointed out both in his report and in the hearing that based on Aetna's SEC filings, Aetna *already performs its own core PBM functions and thus already integrates pharmacy and medical data to lower healthcare costs.*[148]

Most telling has been CVS-Aetna's nonresponse to professor Sood's findings to the effect that the alleged principal efficiency justification for this merger is nonexistent. Instead, in their reply letter, CVS-Aetna reference an OptumRx white paper—a non-peer-reviewed marketing piece—touting the benefits of integrating medical and pharmacy benefits that CVS says lead to substantial premium reductions.[149] However, the white paper actually claims only cost savings and makes no mention of substantial premium reductions. In any event, even assuming a potential efficiency of integrating PBM and health insurance functions, if the experience with past horizontal insurance mergers is prelude in this vertical integration, the benefits are not likely to be passed along to consumers by the merging health insurance company; and in any event, the benefits are neither merger specific nor of a sufficient magnitude to justify the anticompetitive effects of this merger.

---

[144] Id. at 790 citing *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 74-75 (D.D.C. 2009).
[145] Merger Guidelines, §11.
[146] We reference the Horizontal Guidelines and not the 1984 Non-Horizontal Merger Guidelines because the efficiency discussion in the latter has not been updated in 34 years.
[147] Merger Guidelines, Section 10.
[148] See also page 6 supra discussing generally Aetna's self-supplying PPM services in the company's press release announcing its" strategic" arrangement with CVS whereby Aetna retains "our PBM and our ability to integrate medical care with clinical and pharmacy programs and actionable data."
[149] CVS-Aetna Supplemental Submission at 3.

The Honorable Makan Delrahim
August 7, 2018
Page 25

*Potential Efficiency in PBM/Health Insurance Market Does Not Justify This Merger*

Assuming *arguendo* that at some recent time Aetna abandoned its in-house PBM, we will consider here whether the merger would be justified on the claimed basis that it would combine CVS pharmacy data and expertise with Aetna's medical data and expertise as argued by CVS-Aetna.

Some economists, including Craig Garthwaite, PhD, in earlier congressional testimony favoring this merger, are citing economic research (Starc and Town 2015) that suggests a benefit of insurer-PBM integration in the MA and Part D markets.[150] Starc and Town's research suggests that MA-PD plans, which cover both drug and medical expenditures, tend to be designed to offset medical expenditures, as compared to stand-alone PDP plans which only cover drugs. They find MA-PD insurers charge consumers low co-pays for preventive medications-which effectively means sending consumers the right price signals. The findings are consistent with the idea that firms that only cover drugs and are at no risk for higher medical costs would have little incentive to consider the influence of their benefit design decisions on enrollee medical care utilization, whereas firms that cover both would have an incentive to lower medical costs.

To better understand the Starc and Town research cited in the congressional testimony and the extent to which the so-called "alignment of medical and pharmacy benefits" efficiency might favor this merger, the AMA has consulted Professor Starc, the lead co-author of the cited economic research. In her expert report on the CVS-Aetna proposed merger, she concludes that a merged CVS-Aetna entity has the potential to foreclose future entry or raise the cost of current rivals in the PBM industry, the specialty pharmacy market, and critically the Part D market. She further concludes that the potential for foreclosure is likely to have negative impacts on consumer welfare.[151] Ultimately, it is her opinion that "the potential harm to consumer welfare from the proposed merger is likely to outweigh the potential gains."[152]

Professor Starc reached her opinion condemning this merger while at the same time concluding that the alignment of medical and pharmacy benefits is an efficiency that can only be *fully* achieved through *integration* within a firm. However, the efficiency does not meet the Merger Guidelines' "cognizable" standard. According to Professor Starc, the integration efficiency could be fully achieved "by developing an in-house PBM," an approach pursued by other players.[153] Indeed, as described by Professor Sood, "Aetna's own financial statements to the SEC indicate it that already performs its core PBM functions."[154] Alternatively, a potentially large portion of the potential gain could instead be achieved via contract between the insurer and the PBM. An insurer could put the PBM at risk for at least part of medical spending.[155] Even assuming the efficiency were merger specific it would not be of a magnitude that would justify the merger. CVS andAetna claim that the merger will "achieve about $750 million in annual recurring savings."[156] Professor Sood calculates that this represents less than 0.5% of the combined revenues of CVS and Aetna. Thus, the magnitude of claimed benefits is very small relative to the size of operations of the two

---

[150] See Garthwaite, testimony before the House Judiciary Committee at a hearing entitled  "Competition in the Pharmaceutical Supply Chain: the Proposed Merger of CVS Health and Aetna", February 27, 2018, available at https://judiciary.house.gov/wp-content/uploads/2018/02/Garthwaite-REVISED-Testimony and citing Starc A. and Town B. *Internalizing Behavioral Externalities: Benefit Integration in Health Insurance*, 2017, NBER Working Paper No. 21783.
[151] Starc Report at 15.
[152] Starc Report at 16.
[153] Starc Report 13-14.
[154] Sood Report at 9.
[155] Starc Report at 13.
[156] See CVS-Aetna Supplemental Submission at 2.

The Honorable Makan Delrahim
August 7, 2018
Page 26

companies.[157] Moreover, he observes that it is unclear if Aetna already has access to CVS's pharmacy data and if so, the extent to which the merger would lead to better integration of data.[158]

Finally, the magnitude of any alignment of medical and pharmacy benefits is, according to Professor Starc, further limited to the set of contracts joint to Aetna and CVS's PBM plans in which the merged entity is at risk for both medical and pharmacy benefits. In the Part D market, this will be limited by the (lack of) consumer switching from stand–alone plans to MA plans. In the commercial market, this will be limited to fully insured contracts, primarily in the small-group market.[159] Importantly, the potential efficiencies do not apply to self-insured contracts, which compose a significant fraction of Aetna's business and thus substantially diminish the potential for efficiencies.

<u>Unlikely Pass—Through of Cost Savings</u>

Professor Starc further concludes that any cost efficiency created by the merger would not likely translate into lower premiums or more attractive benefit packages for consumers.[160] Even Dr. Garthwaite concedes that consumers will only benefit from the Starc and Town identified efficiency, or any other that might result from the merger, if there is a competitive market in health insurance.[161] This is rarely present, and thus health insurers generally have very little incentive to pass savings along to consumers rather than pocket the total reduction in health care costs.[162] This has been shown in the history of horizontal health insurer mergers. For example, as Harvard professor Leemore Dafny, PhD notes:

> If past is prologue, insurance consolidation will tend to lead to lower payments to healthcare providers, but those lower payments will not be passed on to consumers. On the contrary, consumers can expect higher insurance premiums.[163]

Therefore, the adverse ramifications in the health insurance market of a combined CVS-Aetna, discussed earlier, are likely to swamp any merger-associated cost efficiency.

*Summary of the Efficiency Defense in the Relevant Health Insurance, PBM Markets and Pharmacy Markets Where Competitive Harm Caused by the Merger is Likely*

Perhaps Professor Sood most succinctly summarizes the verdict on this merger in the health insurance, PBM and pharmacy markets:

> Within each of the specific markets—insurance, pharmacy and PBM—in which the merger is likely to have anticompetitive effects, there are no potential benefits of sufficient magnitude and certainty that would outweigh the anticompetitive effects of the merger.[164]

---

[157] Sood Response.
[158] Sood Report at 16.
[159] Starc Report at 14.
[160] Starc Report at 14.
[161] Craig Garthwaite and Fiona M. Scott-Morton, "Perverse market incentives encourage high prescription drug prices." Pro-Market Blog. November 1, 2017.
[162] As explained earlier, competition in health insurance would be made even less likely post a CVS-Aetna merger.
[163] See Dafny, "Health Insurance Industry Consolidation: What Do We Know from the Past, Is It Relevant in Light of the ACA, and What Should We Ask?" Testimony before the Senate Committee on the Judiciary, September 22, 2015, at 10.
[164] Sood Report at 17.

The Honorable Makan Delrahim
August 7, 2018
Page 27

*Claimed Healthcare Provider Efficiencies*

CVS and Aetna however urged the California DOI to consider their efficiency claims in providing medical services. Post-merger the merged entity would route patients needing basic urgent care to walk-in clinics. This, the merging parties say, would keep patients out of expensive hospital emergency departments. CVS has 1100 MinuteClinics in its pharmacies. The clinics are staffed by nurse practitioners and physician assistants who provide routine care such as flu shots. "Think of these stores as a hub of a new way of accessing healthcare services across America," says CVS CEO Larry Merlo. "We're bringing healthcare to where people live and work."[165]

Claimed Health Care Provider Efficiencies Would Not Occur in Markets in which the Effects of the Merger May Be Substantially to Lessen Competition and Thus Cannot Justify the Merger

The CVS-Aetna claimed health care hub-provider efficiencies are irrelevant to whether this merger may substantially lessen competition in the relevant Medicare Part D PDP, health insurance, PBM, retail pharmacy and specialty pharmacy markets. As a matter of law, likely efficiencies must occur *in the specific markets in which the merger is likely to have its anticompetitive effects*. The U.S. Supreme Court made this point clear in *United States v. Philadelphia National Bank,* 374 U.S. 321 (1963), in which the U.S. Supreme Court ruled against a proposed bank merger because it would likely have "the effect of substantially lessening competition in the relevant market."[166] In that case, after concluding the effect of the proposed merger would be substantially to lessen competition, merger proponents argued that the bank merger was justified because it would give the merged bank countervailing market power, which would enable it to compete with large out-of-state banks for very large loans.[167] The Court rejected this "out-of-market efficiencies" justification, stating that:

> If anticompetitive effects in one market could be justified by procompetitive consequences in another, the logical upshot would be that every firm in an industry could, without violating § 7, embark on a series of mergers that would make it in the end as large as the industry leader.[168]

Courts have followed the *Philadelphia National Bank* Court's rejection of out-of-market efficiencies as a cognizable merger justification. As the court in *Law v. NCAA*, 902 F. Supp. 1394 (D. Kan. 1995) stated:

> Procompetitive justifications for price-fixing must apply to the same market in which the restraint is found, not to some other market. See *United States v. Topco Assoc., Inc*., 405 U.S. 596, 610, 31 L. Ed. 2d 515, 92 S. Ct. 1126 (1972) (competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy"); *United States v. Philadelphia National Bank*, 374 U.S. 321, 370, 10 L. Ed. 2d 915, 83 S. Ct. 1715 (1963) (anticompetitive effects in one market cannot be justified by procompetitive consequences in another); *Sullivan v. National Football League*, 34 F.3d

---

[165] "CVS to Buy Aetna for 67.5 Billion, Remaking Health Sector," *Bloomberg Markets* (December 3, 2017), available at https://www.bloomberg.com/news/articles/2017-12-03/cvs-is-said-to-buy-aetna-for-67-5-billion-remaking-industry.
[166] *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 323-324 (1963).
[167] Id. at 370.
[168] Id.

The Honorable Makan Delrahim
August 7, 2018
Page 28

1091, 1112 (1st Cir. 1994) (it seems "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market"),  [**32]  cert. denied, 131 L. Ed. 2d 133, 115 S. Ct. 1252 (1995).[169]

Even if CVS and Aetna could demonstrate that health care hubs will be established as claimed and result in efficiencies, such efficiencies would occur in the market for the provision of primary care services. But such primary care efficiencies are out-of-market in relation to those markets in which the effect of the proposed CVS-Aetna merger may be to substantially lessen competition i.e. the markets for Part D PDP, health insurance, PBM, retail pharmacy and specialty pharmacy. Consequently, under existing case law, any primary care efficiencies that the merged CVS-Aetna might create are neither relevant to, nor justification for, the proposed merger.

<u>The Claimed Health Care Provider Efficiencies are also Wildly Speculative</u>

Notwithstanding their antitrust irrelevance, the CVS-Aetna claim that retail clinics hosted in CVS pharmacies can effectively serve the healthcare hub for patients and consumers were examined by Wharton professor Lawton R. Burns, PhD.[170] In a detailed, richly annotated report, Professor Burns reaches the following conclusions:

> The proposed merger between CVS Health and Aetna is unlikely to yield a long list of benefits advanced by executives from both companies. The documentation on how these benefits are to be achieved is lacking; their evidence base in the scientific literature is questionable; and the implementation challenges are enormous....Any effort to achieve such benefits through the use of retail clinics and analytics is unlikely to succeed. More generally, the strategies of vertical integration and diversification that underlie the merger lack a firm evidence base for any consumer benefits.[171]

David Blumenthal, MD, President of the Commonwealth Fund has similarly found the CVS-Aetna claim that the merger would create strong efficiencies with respect to primary care services to be wildly speculative. He observes in the December 14, 2017, Harvard Business Review:

> To become a Geisinger or an Intermountain equivalent, Aetna-CVS would have to acquire- or develop-seamless relationships with legions of primary care and specialty physicians and hospitals. It would have to turn its stores into medical clinics, with exam rooms, diagnostic laboratories, and x-ray suites. And it would have to install and link electronic health records and other providers in its communities. Having done all this, CVS would have to excel at the very challenging task of managing physicians and other health professionals-something that daily confounds even the most experienced, long time, care-delivery systems. The challenge would be unprecedented, the expense considerable, and the outcome uncertain.

---

[169] *Law v. NCAA*, 902 F. Supp. 1394, 1406 (D. Kan. 1995).
[170] Professor Burns is the James Joo –Jin Kim professor at the Wharton School of the University of Pennsylvania. He is a professor in the Management and Department of Healthcare Management. He teaches courses on the U.S. healthcare system in the industrial organization of healthcare. These courses cover the entire value chain of healthcare including hospitals, managed care organizations, insurers, pharmacies, retail clinics, pharmacy benefit managers and pharmaceutical and medical products.
[171] Burns, Lawton R., "Limits on Consumer Benefits from Proposed Merger of Aetna Inc. into CVS Health Corporation" (Burns Report) Exhibit A at 26. See also Burns, Lawton R., Response to Aetna Supplemental Submission, July 9, 2018 (Burns Response) Exhibit G.

The Honorable Makan Delrahim
August 7, 2018
Page 29


A recent study of 1.3 million Aetna enrollees found that retail clinics result in higher health care spending.[172] A Bloomberg News article entitled, "CVS's Megadeal to Change U.S. Healthcare Faces Stiff Challenges," cautions that, "[t]here are serious challenges to CVS's proposal. Revamping the stores could cost several billion dollars."[173] Also noteworthy is that reputable financial analysts covering the health care industry have dismissed claims of efficiencies in this merger and see the merger as "defensive." For example, Leerink analyst Anna Gupta writes that the "Aetna/CVS deal is still viewed as primarily a defensive play."[174] Bloomberg reports that "Jeff Goldsmith, who runs the healthcare consulting firm Health Futures Inc. is skeptical of the strategy behind the deal, calling it 'flat out baffling,' and says that the MinuteClinics 'lack the clinical acumen or trusting relationships with patients to effectively manage care' and does not 'see it generating new customers for the acquirer or the acquiree, or leverage to lower health costs.'"[175] MorningStar points out that "CVS has significantly overpaid for Aetna," roughly double its standalone fair value.

The DOJ should consider whether the price paid for Aetna reflects an anticompetitive defense of CVS's market power and increases the likelihood that the merger will have anticompetitive effects.

CONCLUSION

For all the reasons expressed by the health economists and other experts both at the June 19 hearing and in their reports accompanying this statement, it is the AMA's opinion that this merger would likely substantially lessen competition in many markets. The nation has learned the hard way that overlooking consolidation in health insurance and PBM markets is costly. The AMA therefore respectfully requests that the DOJ block the proposed CVS-Aetna merger.

Sincerely,

James L. Madara, MD

Enclosures

---

[172] See, Ashwood, Gainer et al. "Retail Clinic Visits for Low-Acuity Conditions Increase Utilization and Spending," *Health Affairs* (Millwood) 2016; 35:449-455.
[173] "CVS's Megadeal to Change US Healthcare Faces Stiff Challenges," *Bloomberg News* (December 22, 2017). See also, "A Force behind the Aetna Bid: Amazon," the *Wall Street Journal* (October 27, 2017).
[174] "Aetna-CVS Deal a Defensive Play As Amazon Threat Looms" *Bloomberg First Word* (Dec 15, 2017).
[175] See, note 173.